SYLLABUS

(This syllabus is not part of the opinion of the Court. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Supreme Court. Please note that, in the interest of brevity, portions of any opinion may not have been summarized.)

**New Jersey Division of Youth and Family Services v. J.G. (A-116-11) (069970)**

**Argued May 14, 2013 -- Decided June 2, 2014**

**RODRÍGUEZ, P.J.A.D. (temporarily assigned), writing for a unanimous Court.**

The issue in this appeal is whether the New Jersey Division of Youth and Family Services (Division) proved by clear and convincing evidence that appellant's parental rights should be terminated pursuant to N.J.S.A. 30:4C-15.1(a).

Appellant J.G. is the birth father of Tara, a girl born in February 2004 ("Tara" is a pseudonym used to protect the identity of the minor). R.G., the child's mother, is also the mother of K.G., a son fathered by another man. In November 2000, J.G. moved in with R.G. and K.G., who was two years old. Appellant supported R.G. and K.G. and, according to him, loved K.G. as his own son. Three years after appellant moved in, Tara was born, four weeks premature. According to appellant, he was part of Tara's life since her birth. He fed her, changed her diapers, took her to doctors, and did the "normal everyday father stuff." Six months after Tara's birth, appellant was arrested for second-degree eluding a police officer. He was convicted and sentenced to an aggregate five-year term in state prison.

The Division's first contact with the family occurred in July 2008, when Tara was four years old. The Division received an anonymous referral that R.G. was abusing alcohol and was endangering the well-being of Tara and her brother. The Division removed the children from R.G.'s home, temporarily placed them with their maternal grandmother, G.B., and visited appellant at the prison to inform him of the removal. Appellant was glad that Tara and her brother were placed in G.B.'s care. The Division provided services to R.G., including psychological evaluations, and substance abuse and psychiatric programs.

The Division filed a verified complaint for care, custody, and supervision of Tara and her brother pursuant to N.J.S.A. 9:6-8.18. The Division presented a plan for reunification, but because R.G. failed to remain alcohol free, it offered a new permanency plan consisting of termination of R.G.'s parental rights to Tara and K.G. and of appellant's parental rights to Tara, to be followed by adoption by G.B. The trial court approved the Division's permanency plan. Subsequently, the Division filed a complaint seeking guardianship of Tara and K.G. pursuant to N.J.S.A. 30:4C-12. In July 2010, R.G. voluntarily surrendered her parental rights to both children, contingent on their adoption by her mother. K.G. was adopted by G.B. Given K.G.'s adoption and R.G.'s voluntary surrender of parental rights to Tara, the sole contested issue was the termination of appellant's parental rights to Tara. During the trial, appellant indicated that he was not seeking custody of Tara, but that he wanted to maintain a relationship with her and be a part of her life. The Division, however, insisted that the permanency plan required termination of all of appellant's parental rights, including contact and visitation with his six-year-old daughter.

Psychologist Robert J. Miller, Ph.D., testified that a nearly six-year absence from Tara's life caused harm to Tara and that the harm could not be remediated in a reasonable time period. He further concluded that there was no bond between appellant and Tara, although he never conducted a bonding evaluation, and opined, "we've missed the window for reunification." Appellant testified about his relationship and extensive caretaking role with Tara during the first six months of her life. He testified that upon his release from prison to a halfway program on April 12, 2007, he spoke to Tara and her mother nearly every day until Father's Day, June 7, 2009. He wrote letters to Tara monthly after the Division became involved with the family, as well as on birthdays and holidays. Appellant claimed that the Division did nothing to facilitate his communications with Tara. While in prison, appellant voluntarily participated in classes on anger management, behavior modification, cognitive behavioral change, reentry preparation, and parenting.

1

The trial court applied the four prong standard for termination of parental rights set by N.J.S.A. 30:4C-15.1(a) and found that the Division failed to prove by clear and convincing evidence that appellant's parental rights should be terminated. The trial court discredited Dr. Miller's testimony, finding that he relied on "flawed information," but credited "highly" appellant's "clear, concise, and inclusive" testimony. The court concluded that the matter should be returned to the Abuse and Neglect Docket calendar for reassessment.

The Division appealed. In an unpublished opinion, a majority of the Appellate Division panel reversed the trial judge's decision. Relying on New Jersey Division of Youth & Family Services v. T.S., 417 N.J. Super. 228 (App. Div. 2010), certif. denied, 205 N.J. 519 (2011), the majority held, in part, "as a matter of law . . . that [appellant's] incarceration, which lasted from when Tara was six months old until after her sixth birthday and prevented the formation of a parental bond, constitute[d] a harm to Tara" pursuant to the first prong of N.J.S.A. 30:4C-15.1(a). The dissenting judge opined that "the Division's evidence -- as found by the trial court -- simply did not measure up" to clear and convincing evidence to satisfy the four prongs of N.J.S.A. 30:4C-15.1(a).

**HELD**: The trial court's finding that the Division of Youth and Family Services failed to prove by clear and convincing evidence that appellant's parental rights should be terminated pursuant to N.J.S.A. 30:4C-15.1(a) is supported by the trial evidence.

1. The applicable standard of review is limited, requiring that the trial court's factual findings be upheld when supported by adequate, substantial, and credible evidence. Concomitantly, reviewing courts should defer to the trial court's credibility determinations. Greater deference is owed to a denial of an application to terminate parental rights than to a grant of an application because a termination of parental rights is final. (pp. 28-30)

2. The United States and New Jersey Constitutions protect parents' rights to maintain relationships with their children. Because of its parens patriae responsibility, the State may terminate parental rights when necessary to protect the child's best interests. N.J.S.A. 30:4C-15.1(a) sets forth the four elements that the Division must prove by clear and convincing evidence before terminating a parent's parental rights. Although incarceration is a relevant factor in resolving termination of parental rights cases, incarceration alone -- without particularized evidence of how a parent's incarceration affects each prong of the best-interests-of-the-child standard -- is an insufficient basis for terminating parental rights. The Division is required to make reasonable efforts to provide services to help the parents correct the circumstances that led to the child's placement outside the home, which may be satisfied when the Division provides services to, and seeks reunification with, the custodial parent from whom the child was removed. However, absent an order under N.J.S.A. 30:4C-11.3, the Division may not ignore requests or avoid providing services to an incarcerated parent. In addition, a child's need for permanency is an extremely important consideration. (pp. 30-39)

3. The Appellate Division majority erred in reversing the trial court's denial of the Division's application to terminate appellant's parental rights. The standard for termination of parental rights is not any different when the parent is incarcerated. The Division failed to show by clear and convincing evidence that appellant's incarceration caused harm to Tara. In addition, because appellant presented evidence that he effectively parented Tara during the first six months of her life, because the Division failed to provide appellant with sufficient services in order to effectuate a successful reunification, and because appellant complied with and participated in all court proceedings related to Tara's care, the trial court's finding that the Division failed to prove clearly and convincingly that appellant is unwilling to remediate the harm his incarceration caused to Tara is supported by credible evidence. Although this Court has stated that providing services to incarcerated persons is difficult and may be futile, and that the Division is permitted to focus its services on the primary caretaker, the Division should not avoid providing services to all incarcerated persons, regardless of their seeming unwillingness to improve their parental fitness. Here, the Division paid only cursory attention to appellant. The trial court's findings of a relationship between appellant and Tara and its credibility determinations that the Division failed to show by clear and convincing evidence that failure to terminate appellant's parental rights would do more harm than good to Tara was not reversible. The trial court's conclusion that the Division failed to prove its case by clear and convincing evidence is supported by the trial evidence. (pp. 39-48)

The judgment of the Appellate Division is **REVERSED**, the decision of the Family Part is

2

**REINSTATED**, and the matter is **REMANDED** to the Family Part for further proceedings consistent with this opinion.

      **CHIEF JUSTICE RABNER; JUSTICES LaVECCHIA, ALBIN, and PATTERSON; and JUDGE CUFF (temporarily assigned) join in JUDGE RODRÍGUEZ's opinion.**

NEW JERSEY DIVISION OF YOUTH
AND FAMILY SERVICES,

    Plaintiff-Respondent,

        v.

R.G.,

    Defendant-Respondent,

        and

J.G.,

    Defendant-Appellant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF T.G.,

    Minor-Respondent,

        and

K.G.,

    Minor-Respondent.

        Argued May 14, 2013 – Decided June 2, 2014

        On appeal from the Superior Court, Appellate
        Division.

        T. Gary Mitchell, Deputy Public Defender,
        Director of Litigation, argued the cause for
        appellant J.G. (Joseph E. Krakora, Public
        Defender Parental Representation, attorney;
        Mr. Mitchell and Beatrix W. Shear, Deputy
        Public Defender, on the briefs).

1

Douglas M. Greene and Eric Foley, Designated Counsel, submitted a brief on behalf of respondent R.G. (Joseph E. Krakora, Public Defender Parental Representation, attorney).

Caryn M. Stalter, Assistant Deputy Public Defender, argued the cause for respondent T.G. (Joseph E. Krakora, Public Defender Law Guardian, attorney).

Jane S. Blank, Deputy Attorney General, argued the cause for respondent New Jersey Division of Youth and Family Services (Jeffrey S. Chiesa, Attorney General of New Jersey, attorney; Andrea M. Silkowitz, Assistant Attorney General, of counsel).

Katherine J. Bierwas, Designated Counsel, argued the cause for respondent K.G. (Joseph E. Krakora, Public Defender Law Guardian, attorney).

Jeyanthi C. Rajaraman argued the cause for amicus curiae Legal Services of New Jersey (Melville D. Miller, Jr., President, attorney; Ms. Rajaraman, Mr. Miller, Mary M. McManus-Smith, and Akil S. Roper, on the brief).

Ronald K. Chen argued the cause for amici curiae American Civil Liberties Union of New Jersey Foundation and The New Jersey Institute for Social Justice (Rutgers Constitutional Litigation Clinic Center for Law & Justice, attorneys; Mr. Chen, Edward L. Barocas, Jeanne M. LoCicero, Alexander R. Shalom, and Craig R. Levine, of counsel and on the brief).

JUDGE RODRÍGUEZ, temporarily assigned, delivered the opinion of the Court.

In this matter, a father was incarcerated six months after the birth of his daughter. He was released five years and four

months later, while a guardianship trial was in progress.  The

birth mother surrendered her rights in favor of her own mother.

The trial court found that the Division of Youth and Family

Services (Division)[1] failed to prove its case for termination of

the father's rights by clear and convincing evidence.  The

majority of the Appellate Division panel reversed and entered

judgment in favor of the Division.  Judge Jonathan N. Harris

dissented, agreeing with the trial court's conclusions drawn

from factual findings.  We reverse the decision of the Appellate

Division majority, reinstate the judgment of the trial court,

and remand to the Family Part for further proceedings.

I.

Appellant J.G. is the birth father of Tara,[2] a girl born in

February 2004.  R.G., the child's mother, is also the mother of

K.G., a son fathered by another man who died in 2001.  R.G.

voluntarily surrendered her parental rights to Tara and K.G.

According to appellant's testimony at the guardianship

trial, in November 2000, he moved in with R.G. and K.G., who was

two years old.  Appellant worked full-time in construction.  He

supported them and paid household bills.  He played a role in

---

[1] On June 29, 2012, the New Jersey Division of Youth and Family
Services was renamed the Division of Child Protection and
Permanency.  See L. 2012, c. 16, § 20 (amending N.J.S.A. 9:3A-
10(b)).

[2] "Tara" is a pseudonym used in this and the Appellate Division
opinion to protect the identity of the minor, T.G.

3

K.G.'s life and saw himself as K.G.'s stepfather.  According to appellant, he loved K.G. as "my son."

Three years after appellant moved in with K.G. and R.G., Tara was born in February 2004, four weeks premature.  According to appellant, he was part of Tara's life since her birth.  He "learned how to feed her [and] how to give her two ounces of milk every four hours" while she spent the first four weeks of her life in a hospital.  After Tara was discharged from the hospital, she lived with her mother, K.G. and appellant, who continued to take care of her.  Appellant fed Tara, changed her diapers, took her to the doctor, and did "normal everyday father stuff."

Six months after Tara's birth, appellant was arrested for second-degree eluding a police officer.  In October 2004, he pleaded guilty to that charge and to a violation of probation.  In December 2004, he was sentenced to an aggregate five-year term in state prison.  After appellant began serving his sentence, Tara and her brother remained in the care and custody of their mother, R.G.  Appellant spoke with R.G. regularly about the children, but requested that, due to their age, the children not visit him in prison.  However, he did see Tara in 2007 on Father's Day.  The children lived with their mother for another three years and seven months.

II.

4

The Division's first contact with the family occurred in July 2008, when Tara was four years old. The Division received an anonymous referral that R.G. was abusing alcohol and was endangering the well-being of Tara and her brother. The Division's investigation revealed that the children feared their mother's behavior when she abused alcohol and that their home was unsanitary. R.G. smelled of alcohol when she was interviewed by the Division's caseworker.

The Division removed Tara and her brother from R.G.'s home and temporarily placed them with their maternal grandmother, G.B. Contemporaneously, the Division caseworker visited appellant at Riverfront State Prison to inform him of the removal. Appellant stated that he was glad that Tara and her brother were placed in the care of their maternal grandmother. The Division provided services to R.G., including psychological evaluations, and substance abuse and psychiatric programs.

The Division filed a verified complaint for care, custody, and supervision of Tara and her brother pursuant to N.J.S.A. 9:6-8.18. At a July 2009 permanency hearing, the Division presented a plan for reunification. However, the trial court granted the Division's request for an extension to evaluate R.G.'s progress and continued Tara and her brother's placement with their maternal grandmother. The trial court also permitted

the continuation of communications between appellant and the children and authorized the Division to screen appellant's letters to them.

Several months later, at an October 2009 permanency hearing, due to R.G.'s failure to remain alcohol-free, the Division offered a new permanency plan consisting of termination of R.G.'s parental rights to Tara and K.G. and of appellant's parental rights to Tara, to be followed by adoption by the maternal grandmother. However, kinship legal guardianship (KLG) options had not been explored by the Division. The trial court approved the Division's permanency plan. The next day, the Division explained to the maternal grandmother the processes of adoption and KLG. The grandmother expressed her preference to adopt the children.

B.

Subsequently, the Division filed a complaint seeking guardianship of Tara and K.G. pursuant to N.J.S.A. 30:4C-12. In July 2010, R.G. voluntarily surrendered her parental rights to both children, contingent on their adoption by her mother. K.G. was adopted by the maternal grandmother.

At the start of the trial, on July 12, 2010, appellant was transported by the Department of Corrections (DOC) and lodged at the Bergen County Jail for several trial days. Given K.G.'s adoption and R.G.'s voluntary surrender of parental rights to

6

Tara, the sole contested issue was the termination of appellant's parental rights to Tara. The only attorneys participating at the trial were the representatives of the Division, appellant, and Tara's law guardian.

During the trial, appellant indicated that he was not seeking custody of Tara, but that he wanted to maintain a relationship with her and be a part of her life. Appellant consented to Tara remaining in her maternal grandmother's custody. At that point, the focus of the hearing was further narrowed because appellant only sought contact and visitation with Tara in order to foster and enhance their present relationship. He made it clear that he was not in a position to be the custodial parent. The Division, however, insisted that the permanency plan required termination of all of appellant's parental rights, including contact and visitation with his six-year-old daughter.

Division caseworker Jill DePeri was the first witness at the trial. According to DePeri, Tara and her brother had a close relationship. She testified that Tara was happy living with her grandmother, and that Tara wanted to be adopted by her.

She testified that the Division generally provides no particular services, such as substance abuse treatment or parenting skills, to incarcerated persons. Moreover, she testified that as far as she knew, psychological evaluations

were the only services that the Division provided to inmates. DePeri confirmed that an August 18, 2008 meeting between another Division caseworker and appellant was the only time Division personnel met with him while he was in prison. DePeri stated that she spoke with appellant by telephone on March 9, 2010, and appellant told her that he had no objections to Tara's placement with the maternal grandmother. In answer to DePeri's question about his plans for caring for Tara upon his release, he answered that he wanted to maintain contact with her and be a part of her life.

DePeri also testified that she encouraged Tara to send letters and photographs to appellant. Appellant responded to Tara's letters shortly after receiving them. Tara reported to DePeri that her father "always wrote back [to her]." Subsequently, DePeri advised appellant to use prepaid telephone cards to make calls to Tara from prison because the maternal grandmother refused to accept future collect calls, because previous calls resulted in a $600 telephone bill. DePeri confirmed that prior to December 2009, there was no record of the Division encouraging communication between appellant and his daughter either by letter or telephone.

DePeri stated that five months before the trial, a Division caseworker sent a letter to the correctional facility where appellant was held, requesting information about his

participation in programs. She testified that the Division never compared DOC programs to Division programs. During a conference call three weeks later, the Division learned that appellant was scheduled to be released in September 2010, but could be released as early as August 2010, depending on his conduct.

Psychologist Robert J. Miller, Ph.D., testified that he conducted two evaluations of appellant on August 4, 2009 and June 24, 2010. After the first evaluation, Dr. Miller concluded that appellant was unable to ensure Tara's safety, care, and emotional nurturance, explaining that appellant "by virtue of his own behavior, takes himself out of the parenting task" because of his incarceration during a critical period of Tara's development. Dr. Miller testified that appellant appeared dismissive, angry, or defensive while discussing K.G.'s desire not to have appellant in his life. Dr. Miller explained that he considered R.G.'s unsubstantiated allegations that appellant physically abused her in determining that appellant could not perform the functions of a primary caretaker.

After the second evaluation of appellant, Dr. Miller reported that appellant appeared more confrontational than during their first interaction. Appellant had not participated in further programs since his first evaluation, and Dr. Miller opined that in light of his parental deficiencies, appellant

9

needed years of post-release therapy in which he was disinclined to engage. Dr. Miller explained that a nearly six-year absence from Tara's life caused harm to Tara and could not be remediated in a reasonable time period.

Dr. Miller concluded there was no bond between appellant and Tara, although he never conducted a bonding evaluation. He reasoned that a bonding evaluation would not have been helpful regardless of the number of letters or phone calls because Tara's original attachment to appellant could never be recovered, and their relationship certainly could not commence until appellant was released from prison. Appellant's long absence from Tara caused the lack of a bond between the two, and thus Dr. Miller opined, "we've missed the window for reunification."

Dr. Miller conducted a bonding evaluation of Tara and her maternal grandmother and concluded that there was a strong bond between them, as well as between Tara and K.G. Thus, he concluded that the maternal grandmother's adoption of Tara was in Tara's best interest because delaying her permanency would only cause her additional harm.

G.B., Tara's grandmother, testified that the Division's counsel spoke to her about KLG and adopting Tara. She confirmed her willingness and capability to adopt Tara. With respect to

10

the possibility of KLG as a disposition, the grandmother testified:

> It's basically the same [as adoption]. But with KLG, if anything should happen to me, what happens to the children? With adoption I have my daughter that has two children that one is in college and one is [K.G.'s] age. And she would take them. She would adopt them and keep them in her family.

The grandmother expressed her desire to adopt Tara because:

> I just want [Tara and K.G.] to have stability. I want the children to have stability to know where they're living. And if I do adopt, I'm not changing their names. They're going to be their own person. And I'm going to keep their mother and father in the picture. I'm -- I'm still going to be their grandmother.

Appellant testified about his relationship and extensive caretaking role with Tara during the first six months of her life. Appellant acknowledged that on the day Tara was born he was in jail. R.G. bailed him out on the day she left the hospital.

Appellant began serving his sentence in August 2004. Upon appellant's release from prison to a halfway program on April 12, 2007, he spoke to Tara and her mother nearly every day until Father's Day, June 7, 2009. On that day, appellant took several forms of transportation to see his daughter, purchased for K.G. and Tara videos that they liked, and then visited them at the maternal grandmother's home. He wrote letters to Tara monthly

after the Division became involved with the family in July 2008, as well as on birthdays and holidays. The Division provided him with no letters from the children until he complained in December 2009.

Meanwhile, appellant voluntarily participated in classes on anger management, behavior modification, cognitive behavioral change, reentry preparation, and parenting while in prison. He claimed that he requested Tara's school records from the Division but none were provided. He also claimed that the Division never provided him with prepaid calling cards or financial support to purchase the cards to call Tara. He testified that, shortly before trial, Tara told him on a telephone call, "I love you daddy," and "I can't wait for you to come home so we could watch movies together."

Noting that he was presently incarcerated, appellant testified that he would "max out," or reach his maximum term on September 8, 2010. Appellant described his post-incarceration plans as follows:

> Ideally what I really want to do is go up to Lake George for a couple weeks, rest, and then I was going to stay at a friend's house and then come back and start my job and stay with a friend for about a month until I get enough money for an apartment.

He explained that he would be unable to care for Tara immediately upon his release and "never disputed" that Tara

12

should remain with the maternal grandmother.  He also expressed that he understood the care that the maternal grandmother provided to Tara, but that he desired to maintain a relationship with Tara and "be part of [her] life."  R.G., the birth mother, did not testify at the trial.

                              C.

In a written opinion dated October 4, 2010, the trial court found that the Division failed to prove by clear and convincing evidence that appellant's parental rights with respect to Tara should be terminated.  The trial court applied the four prong standard for termination of parental rights set by N.J.S.A. 30:4C-15.1(a) to the evidence presented and made detailed findings.[3]  First, the trial court considered whether appellant's

_____

[3](1)  The child's safety, health or development has been or will continue to be endangered by the parental relationship;

(2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child;

(3) The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to

13

incarceration constituted abandonment as defined by N.J.S.A. 30:4C-15.1(b) because abandonment was the only harm that the Division's complaint alleged against appellant. The judge concluded that, despite the Division's contention that appellant and Tara had no relationship, the record established that there was no period greater than six months during which appellant had no contact with Tara. The trial court found that the record indicated that appellant (1) parented Tara for the first six months of her life, (2) communicated with R.G. regarding Tara and K.G. prior to the children's removal from R.G., and (3) directly communicated with Tara and K.G. via telephone and letters thereafter. Thus, the judge found that, pursuant to N.J.S.A. 30:4C-15.1(a), there was "an insufficient showing that [Tara] was endangered by the incarceration of her father" and the Division's complaint articulated no other types of harm that appellant caused to Tara.

Second, the trial court concluded that there was insufficient evidence that appellant was unable or unwilling to remediate any harm that his incarceration caused to Tara because the Division provided little, if any, services to him to devise

termination of parental rights; and

(4) Termination of parental rights will not do more harm than good.

[N.J.S.A. 30:4C-15.1(a).]

14

a plan to remedy the alleged harm. The court reasoned that, termination was opposed by both R.G. and the maternal grandmother at the time of the Division's complaint to terminate both parents' parental rights. It commented that understanding the importance of Tara's stability, appellant had consistently explained that he did not want to separate Tara from the maternal grandmother, who could provide the consistent care that he was not able to provide at the time of his release. The court noted that despite his criminal history for cocaine possession, resisting arrest, theft, joyriding, burglary, hindering apprehension, and a single aggravated assault on a police officer, "[n]othing has been shown that the nature of these offenses is so abhorrent to society that would require" terminating appellant's parental rights. In the trial court's view, those crimes did not impede appellant from communicating with Tara and K.G., as the Division's expert acknowledged.

Third, the judge determined that although the Division provided extensive services to R.G., she failed to respond positively to nearly all of the services provided. To the trial court, R.G.'s failure to respond to services, however, did not suggest that appellant was undeserving of services, or that he was provided with sufficient services, particularly because the Division misinformed the maternal grandmother about providing communications from appellant to Tara and misinformed appellant

15

about his ability to obtain calling cards from the Division to call Tara. The trial court also concluded that the Division exceeded its authority pursuant to an August 28, 2008 order by not only screening appellant's letters to Tara but also letters from Tara and K.G. to appellant. The court noted that appellant also sought services on his own, but his efforts were overlooked by the Division, and he was simply ignored and disregarded.

Finally, with respect to whether termination of appellant's parental rights would do more harm than good, the trial court found that the record was replete with examples of Tara's affinity towards appellant and appellant being a part of Tara's life -- both in-person and over the telephone:

> [Appellant] has taken various steps to rehabilitate himself and has nurtured an attachment to his daughter. He was encouraged to write and telephone his daughter which he did regularly. He testified to calling home frequently when he first went away. Upon learning the children were taken from their mother, he immediately began writing to them. [K.G.] sent him two letters in which he stated his love for [appellant]. . . . [Appellant] also testified to his relationship with his daughter. Before the trial they spoke by telephone and she said "I love you daddy."

Further, the trial court discredited Dr. Miller's testimony because there were no criminal convictions or proofs submitted substantiating R.G.'s claim that appellant abused her. In fact, the children testified that a different boyfriend of R.G. abused

16

her.  Moreover, Dr. Miller relied on "flawed information" that the Division had provided appellant with services in prison. Instead the judge credited "highly" the nonevasive "clear, concise, and inclusive" testimony of appellant.  The trial court concluded that the matter should be returned to the Abuse and Neglect Docket calendar for reassessment.

D.

The Division appealed.  In an unpublished opinion, a majority of the Appellate Division panel reversed the trial judge's decision not to terminate appellant's parental rights. Relying on New Jersey Division of Youth & Family Services v. T.S., 417 N.J. Super. 228 (App. Div. 2010), certif. denied, 205 N.J. 519 (2011), the majority held "as a matter of law . . . that [appellant's] incarceration, which lasted from when Tara was six months old until after her sixth birthday and prevented the formation of a parental bond, constitute[d] a harm to Tara" pursuant to the first prong of N.J.S.A. 30:4C-15.1(a).  With respect to the second prong of the statutory test, the majority concluded that appellant is "unable or unwilling to provide a safe and stable home for [Tara] and the delay of permanent placement will add to [her] harm" because: Tara was "entitled to a legally permanent, safe and secure home"; KLG is not a preferred placement when adoption is an option; and appellant

17

did not request to serve as Tara's primary or secondary caretaker.

Regarding the third prong, the appellate majority disagreed with the trial court's finding that the Division failed to provide appellant with services because it was "impeded by the difficulty and likely futility of providing services" to appellant while he was in prison. Although acknowledging that the Division could have facilitated greater communication between appellant and Tara, the majority concluded that the services provided to R.G. were enough to satisfy the Division's obligations "as a matter of law," especially because appellant was not seeking "true reunification." Finally, the panel majority explained that "[t]ermination of [appellant's] parental rights [would] not do more harm than good" because Tara's relationship with her grandmother is much stronger and more nurturing than her "tenuous" relationship with appellant, and Tara's placement with the maternal grandmother is permanent and would allow her to foster her strong relationship with K.G.

E.

The dissenting judge, citing N.J. Div. of Youth & Family Servs. v. C.S., 367 N.J. Super. 76 (App. Div.), certif. denied, 180 N.J. 456 (2004), noted that this is one of only two cases in which the Appellate Division has reversed a trial court's denial of an application to terminate parental rights. The dissenting

18

judge further explained that reversal is rare because termination cases are "encased in a double layer of deference," including the substantial deference owed to a trial court's findings of fact and to Family Part judges' expertise in these matters.

III.

A.

Appellant contends that this appeal concerns not only his "fair shot" to have a positive role in Tara's life but also Tara's right not to "suffer permanent severance of family bonds that evidence promise." Appellant argues that the complaints against him included no allegation of abuse or neglect. He contends that he contributed to a strong family unit prior to his incarceration and worked before, during, and afterwards to develop, maintain, and improve his relationship with Tara and K.G. Appellant notes that the trial court did not credit Dr. Miller's evaluations because he did not know the Division failed to provide appellant with services. Appellant also argues that his inability to take custody of Tara should not, as a matter of law, constitute causing more harm than good to her because he is willing to provide for Tara. Finally, appellant argues that none of his convictions were so abhorrent to justify terminating his parental rights.

Appellant challenges the Appellate Division majority's failure to defer to the trial court's findings when future remedies exist to limit appellant's interactions with Tara, and its disregard of the clear and convincing evidence standard in termination cases. He argues that the panel imposed its views of the record in an admittedly close case, even though "all doubts must be resolved against termination," (quoting In re Guardianship of K.H.O., 161 N.J. 337, 347 (1999)). According to appellant, the panel improperly focused on appellant's incarceration in the name of Tara's permanency, and this decision rendered restoration of their relationship impossible. Appellant argues that incarceration alone is not sufficient harm to support termination of parental rights, and that the view that a parent's incarceration is unpardonable obviates the fact-intensive nature of the best-interests-of-the-child standard. Appellant also notes that "New Jersey law does not make relinquish[ing] physical custody tantamount to termination of parental rights."

Turning to factor three of the best-interests test, appellant contends that noncustodial parents deserve services from the Division and that the statute's plain language contravenes any other interpretation because legislative policy is to reunify families when possible. Appellant maintains that the Division's "paltry" two attempts to provide him services

20

were insufficient to satisfy prong three. He argues that failure to consider placement alternatives short of adoption contravenes this Court's ruling in New Jersey Division of Youth & Family Services. v. A.W, 103 N.J. 591, 611 (1986), because KLG by the maternal grandmother would have been proper considering that appellant was not deemed unfit and reunification was only infeasible in the immediate future.

Finally, with respect to factor four, appellant argues that the trial court's finding -- that terminating appellant's parental rights would not cause more harm than good to Tara -- should have been upheld.

### B.

In response, the Division argues that the panel was correct to terminate appellant's parental rights because appellant's reunification with Tara was not achieved in the statutory timeframe due to appellant's incarceration; Tara has a strong and permanent bond with the maternal grandmother; and appellant is not seeking true reunification with Tara. It argues that the statutory amendments to N.J.S.A. 30:4C-15 et seq. and case law have shifted the "emphasis in guardianship proceedings . . . from protracted efforts favoring family reunification to those which underscore the health, safety and welfare of the child and effect an expeditious and permanent plan for the child." According to the Division, the trial court improperly weighed,

21

as a matter of law, the harm that appellant's incarceration and the disruption to Tara's relationship and permanency with the maternal grandmother would cause to Tara.

The Division first argues that the consequences flowing from appellant's antisocial behavior, including his physical absence from Tara's life, his inability to provide for Tara's safety after her removal from her mother's care, her placement in foster care, and his decreased communications and strained relationship with her caused harm to Tara. Second, the Division contends appellant failed "to provide a safe and stable home for Tara within a reasonable period of time." The Division argues that experts confirmed appellant was unable to provide consistent care and lacked awareness of the impact of his absence on Tara's development. Moreover, the Division argues that disrupting Tara's relationship with her maternal grandmother and brother would have a negative impact.

Third, the Division asserts that it provided reasonable services to appellant because its services were provided based on this family's specific needs and the "difficulty and likely futility of providing services to a person in custody." The Division avers that it encouraged appellant and Tara to write to each other while he was incarcerated, updated him on the court proceedings about Tara's care, and focused its services on R.G. and the maternal grandmother. Finally, the Division argues that

22

because the possibility of KLG cannot serve as a basis for denying a feasible adoption, terminating appellant's parental rights was appropriate, (citing N.J. Div. of Youth & Family Servs. v. P.P., 180 N.J. 494, 510 (2004)).

C.

Tara's law guardian, K.G.'s law guardian, and R.G. reiterate many of the arguments advanced by the Division. Tara's law guardian adds that the trial court erred in its analysis of the first prong by focusing only on the nature of the appellant's convictions.  Additionally, because Tara's bond with her maternal grandmother was much deeper than the almost non-existent one with appellant, failure to place Tara permanently with her grandmother would result in more harm than good.

K.G.'s law guardian adds that the Court should focus on several factors to determine the harm that incarceration caused, including the child's age, the length of the separation, the strength of the family, the child's relationship with the new caregiver and the parent, as well as the nature of the crime and the stigma that is associated with it, (citing Wright & Seymour, Working with Children and Families Separated by Incarceration: A Handbook for Child Welfare Agencies, 77 Child Welfare: J. of Policy, Practice & Program 5 (Sept. 1998, reprinted 2001)). Moreover, relying on Dr. Miller's evaluation, K.G.'s law

23

guardian contends that appellant's future relationship with Tara could cause harm because appellant perceives the maternal grandmother as an "adversary."

D.

As amicus curiae, Legal Services of New Jersey (LSNJ) argues that the majority improperly terminated appellant's parental rights. It first discusses the challenges that inmates face in maintaining familial relationships. LSNJ then contends that a parent's incarceration is insufficient evidence of harm to terminate parental rights; instead, it is a factor to consider in a totality of the circumstances analysis.

Thus, LSNJ argues that the majority substituted its judgment for the trial court's findings, despite the special deference owed to judges' credibility determinations in termination cases. It incorrectly determined that the length of appellant's incarceration was "a sufficient basis to find prong one harm" despite appellant's best efforts to parent Tara while he was incarcerated, without the Division's help, and despite the trial court's findings of a strong parent-child bond. Additionally, the panel majority failed to assess if appellant's prior convictions created a future risk of harm, even though the trial court found no nexus between those offenses and a future risk of harm.

24

With respect to prong two, LSNJ contends that appellant developed a strong relationship with and cared for Tara prior to his incarceration and went to prison believing Tara would be under R.G.'s care. Appellant also took steps to reenter society, not recidivate, and agreed to Tara's placement in a stable and safe home. Without a bonding evaluation of appellant and Tara, LSNJ maintains that the panel majority incorrectly determined that disrupting Tara and the maternal grandmother's bond would cause more harm than severing Tara and appellant's relationship.

Concerning prong three, LSNJ asserts that, because incarcerated parents often request that their children not visit them in prison, the Division should have provided other services to appellant to supplement his participation in prison-run programs. The Division improperly focused solely on providing services to R.G. and ignored or disregarded appellant. The Division should also have evaluated the possibility of KLG, even though the maternal grandmother was willing to adopt Tara. Lastly, with respect to prong four, LSNJ argues that failing to acknowledge Tara's desire to deepen her bond with appellant and the resulting harm of severing her bond with appellant overlooks credible evidence that terminating appellant's parental rights would cause more harm than good to Tara.

E.

American Civil Liberties Union of New Jersey (ACLU-NJ) and New Jersey Institute for Social Justice (NJISJ), as amici curiae, request that this Court "direct the Division to develop standard procedures by which it shall discharge its obligation to incarcerated or recently incarcerated parents to provide appropriate services aimed toward reunification" because the Appellate Division effectively relieved the Division of its statutory duty to make reasonable efforts. They explain that the increase of incarcerated persons in New Jersey requires, as a matter of sound policy, "a more particularized statement of reasonable efforts in the context of incarcerated parents." Amici argue that because the objectives of permanency and stability were already established by Tara's placement with the maternal grandmother, no harm to Tara was alleviated by terminating appellant's parental rights, and particularized harm to Tara must be proven by clear and convincing evidence.

ACLU-NJ and NJISJ add that suggesting that incarcerated parents have difficulty performing the "composite of tasks" of parenthood "and cannot continue to undertake or to share the daily responsibilities of raising a child" overly generalizes the type of harm suffered by children whose parents are in prison. It also undermines the deference owed to fact finders in termination cases. For example, appellant's decision not to assume care of Tara should not weigh in favor of terminating his

26

parental rights when the trial court found that appellant's decision was prudent and realistic in light of the difficulties he faced in reentering society.

The ACLU-NJ and NJISJ argue that, after acknowledging the deficient services provided to appellant, the Appellate Division held, as a matter of law, that providing sufficient services to one custodial parent satisfies the Division's obligation as to both parents. However, amici curiae contend that New Jersey law does not allow the Division to ignore or refuse to provide services to all incarcerated parents, and failing to provide incarcerated parents with the services outlined in N.J.S.A. 30:4C-15.1(c) is not supported by the statute's plain language and contravenes the intent of the best-interests-of-the-child standard. ACLU-NJ and NJISJ aver that failing to provide services effectively imposes an additional punishment of termination of parental rights on incarcerated persons, making it more likely that the person will recidivate and causing additional harm to the family and society. According to amici, those collateral consequences contradict federal policy aimed at reducing the collateral consequences imposed on inmates, who amici identify as disproportionately African American and Hispanic American persons.

ACLU-NJ and NJISJ also argue that, because incarceration deprives a child of emotional support from his or her parent,

27

failing to provide services to incarcerated persons only exacerbates harm to the child and to the family generally. As a result, amici submit that this Court should require the Division to adopt a practice guide and program standards that lay out what "particularized reasonable efforts" should be for dealing with incarcerated parents.

IV.

A.

Because J.G. appeals as of right pursuant to Rule 2:2-1(a)(2), our review is limited to the issue raised in the dissent. See R. 2:2-1(a)(2) ("Appeals may be taken to the Supreme Court from final judgments as of right . . . in cases where, and with regard to those issues as to which, there is dissent in the Appellate Division." (emphasis added)).

Here, the dissenting judge opines that "the Division's evidence -- as found by the trial court -- simply did not measure up" to clear and convincing evidence to satisfy the four prongs of N.J.S.A. 30:4C-15.1(a).

Thus, the standard of review applicable in this matter is appellate review of a trial court's order terminating parental rights. This standard is limited. In re Guardianship of J.N.H., 172 N.J. 440, 472 (2002). In such cases, the trial court's factual findings should be upheld when supported by adequate, substantial, and credible evidence. N.J. Div. of

28

Youth & Family Servs. v. E.P., 196 N.J. 88, 104 (2008). Concomitantly, reviewing courts should defer to the trial court's credibility determinations. See Cesare v. Cesare, 154 N.J. 394, 412-13 (1998). "[B]ecause it has the opportunity to make first-hand credibility determinations about the witnesses who appear on the stand; it has a 'feel of the case' that can never be realized by a review of the cold record." E.P., supra, 196 N.J. at 104. However, "where the focus of the dispute is . . . alleged error in the trial judge's evaluation of the underlying facts and the implications to be drawn therefrom, the traditional scope of review is expanded." In re Guardianship of J.T., 269 N.J. Super. 172, 188-89 (App. Div. 1993) (citation and internal quotation marks omitted). "A trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." Manalapan Realty v. Manalapan Twp. Comm., 140 N.J. 366, 378 (1995).

Moreover, by virtue of its specific jurisdiction, the Family Part "possess[es] special expertise in the field of domestic relations" and thus "appellate courts should accord deference to [F]amily [Part] factfinding." Cesare, supra, 154 N.J. at 412-13. Additionally, as the dissenting judge in the Appellate Division noted, greater deference is owed to a denial of an application to terminate parental rights than to a grant

of an application because a termination of parental rights is final and cannot be re-visited by the court.  See In re Guardianship of S.C., 246 N.J. Super. 414, 428 (App. Div. 1991).

Finally, as stated by the Appellate Division dissent in the present matter, "[t]erminations should be granted sparingly and with great caution because they irretrievably impair imperative constitutionally-protected liberty interests and scores of centuries of societal family constructs."  Thus, "[w]e should scorn the undoing of that deliberative and comprehensive approach unless the trial court's findings were 'so wide of the mark' that a mistake must have been made."  (quoting N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 279 (2007)).

B.

We turn now to the legal standard applicable in cases involving termination of parental rights.  The United States and New Jersey Constitutions protect parents' rights to maintain relationships with their children.  K.H.O., supra, 161 N.J. at 346 (citing Stanley v. Illinois, 405 U.S. 645, 651, 92 S. Ct. 1208, 1212, 31 L. Ed. 2d 551, 558-59 (1972)).  Although courts impose "strict standards for the termination of parental rights," parental rights are not absolute.  Id. at 347.  Because of its parens patriae responsibility, the State may terminate parental rights if the child is at risk of serious physical or emotional harm or when necessary to protect the child's best

30

interests.  A.W., supra, 103 N.J. at 599.  The best-interests-of-the-child standard codified at N.J.S.A. 30:4C-15.1(a) "aims to achieve the appropriate balance between parental rights and the State's parens patriae responsibility."  M.M. supra, 189 N.J. at 280.

Pursuant to N.J.S.A. 30:4C-15.1(a), parental rights may be terminated when:

> (1) The child's safety, health or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child;
>
> (3) The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and
>
> (4) Termination of parental rights will not do more harm than good.

These elements are not discrete and separate; they overlap to offer a full picture of the child's best interests.  M.M., supra, 189 N.J. at 280.  "The considerations involved are extremely fact sensitive and require particularized evidence

that address[es] the specific circumstance in the given case."
Ibid. (citations and internal quotation marks omitted).  The
Division must prove by clear and convincing evidence that all
four statutory criteria are satisfied.  E.g., ibid.

Pursuant to the first prong, "[t]he harm shown . . . must
be one that threatens the child's health and will likely have
continuing deleterious effects on the child."  K.H.O., supra,
161 N.J. at 352; accord M.M., supra, 189 N.J. at 281.  The State
must "demonstrate harm to the child by the parent," which
"involves the endangerment of the child's health and development
resulting from the parental relationship."  N.J. Div. of Youth &
Family Servs. v. I.S., 202 N.J. 145, 170 (2010) (citation and
internal quotation marks omitted).  "Incarceration is . . .
probative of whether the parent is incapable of properly caring
for . . . or has abandoned the child."  In re Adoption of
Children by L.A.S., 134 N.J. 127, 136 (1993).

In L.A.S., this Court considered whether an incarcerated
father's sentence to life in prison for first-degree murder
justified terminating his parental rights.  Id. at 130.  The
Court pronounced that incarceration alone is insufficient to
prove parental unfitness or abandonment and terminate parental
rights.  Id. at 137; see also N.J.S.A. 30:4C-15.1(b) (detailing
current three statutory bases for terminating parental rights on
abandonment grounds).  It found that unquestionably,

32

incarceration is a relevant factor in resolving termination of parental rights cases. L.A.S., supra, 134 N.J. at 138. "However, it is by no means settled or obvious that incarceration is so inimical to that relationship as to justify its termination as a matter of law." Id. at 137. That said, an incarcerated parent has difficulty "performing the 'composite of tasks' associated with parenthood and cannot continue to undertake or to share the daily responsibilities of raising a child." Id. at 138-39. The Court continued:

> [A] parent's lengthy incarceration is a material factor that bears on whether parental rights should be terminated. Incarceration may be such a factor based on either abandonment or parental unfitness. Further, we conclude that the nature of the underlying crime giving rise to incarceration is relevant in determining whether parental rights should be terminated, because it may bear on parental unfitness. We also determine that the hearing to decide whether parental rights should be terminated must be based on a broad inquiry into all the circumstances bearing on incarceration and criminality, and must include an assessment of their significance in relation to abandonment or parental unfitness.
>
> [Id. at 143.]

The Court remanded the case for consideration of whether the circumstances surrounding the father's lengthy incarceration were sufficient to terminate his parental rights based on the following factors:

33

> [P]erformance as a parent before incarceration, to what extent his children were able to rely on him as a parent, and what effort, if any, he has made to remain in contact with his children since his incarceration. The court should also consider whether [the parent] will be able to communicate and visit with his children; what effect such communications and visitation will have on the children in terms of fulfilling the parental responsibility to provide nurture and emotional support, to offer guidance, advice, and instruction, and to maintain an emotional relationship with his children. Further, the court must consider the risk posed to his children by [the parent]'s criminal disposition; what rehabilitation, if any, has been accomplished since [the parent]'s incarceration; and the bearing of those factors on the parent-child relationship. The court should, with the aid of expert opinion, determine the need of the children for permanency and stability and whether continuation of the parent-child relationship with [the parent] will undermine that need. Further, the court should determine the effect that the continuation of the parent-child relationship will have on the psychological and emotional well-being of the children.
>
> [Id. at 143-44.]

Although the 1997 and 1999 amendments to N.J.S.A. 30:4C-15 now outline the current best-interests-of-the-child standard, see L. 1999, c. 53, § 30 (eff. Mar. 31, 1999); L. 1997, c. 175, § 18, the principles articulated in L.A.S. retain continued vitality in our application of the current version of N.J.S.A. 30:4C-15.1(a). We therefore reiterate that incarceration alone -- without particularized evidence of how a parent's

34

incarceration affects each prong of the best-interests-of-the-child standard -- is an insufficient basis for terminating parental rights.  See L.A.S., supra, 134 N.J. at 137-38.  L.A.S. identified several factors for courts to consider when evaluating whether a parent's incarceration supports or cautions against terminating parental rights.  See id. at 143-44.  Such an analytical approach reflects New Jersey courts' historic commitment to fact-sensitive analyses when deciding termination of parental rights cases.  See, e.g., N.J.S.A. 30:4C-15.1(a); M.M., supra, 189 N.J. at 280.  These factors apply to the analysis for the termination of appellant's parental rights.

Pursuant to the second prong of N.J.S.A. 30:4C-15.1(a), the Division must prove "that the child will suffer substantially from a lack of stability and a permanent placement and from the disruption of [his or] her bond with foster parents."  K.H.O., supra, 161 N.J. at 363; accord M.M., supra, 189 N.J. at 281.

> The State must show not only that the child's health and development have been and continue to be endangered, but also that the harm is likely to continue because the parent is unable or unwilling to overcome or remove the harm. That inquiry is aimed at determining whether the parent has cured and overcome the initial harm that endangered the health, safety, or welfare of the child, and is able to continue a parental relationship without recurrent harm to the child. Alternatively, under this second criterion, it may be shown that the parent is unable to provide a safe and stable home for the child and that the delay in securing

permanency continues or adds to the child's harm.

[K.H.O., supra, 161 N.J. at 348-49 (internal citations omitted).]

However, parents must remedy or show they are able to remedy harm to the child in advance of reunification within the time limits established in 42 U.S.C.A. § 671, the federal Safe Families Act of 1977; C.S., supra, 367 N.J. Super. at 111.

The third prong of N.J.S.A. 30.4C-15.1(a) requires the Division to make reasonable efforts to provide services to help the parents correct the circumstances that led to the child's placement outside the home. N.J.S.A. 30:4C-15.1(a)(3). Reasonable efforts include consulting with the parent, developing a reunification plan, providing services essential to realizing the reunification plan, informing the family of the child's progress, and facilitating visitation. M.M., supra, 189 N.J. at 281 (citing N.J.S.A. 30:4C-15.1(c)). The Division "must monitor the services, change them as needs arise, and identify and strive to overcome barriers to service provision or service utilization." In re Guardianship of D.M.H., 161 N.J. 365, 387 (1999) (citation and internal quotation marks omitted). The Division must "encourage, foster and maintain" the parent-child bond, "promote and assist in visitation," inform the parent "of the child's progress in foster care" and inform the parent of

36

the "appropriate measures he or she should pursue . . . to . . . strengthen" their relationship. Id. at 390.

Reasonable efforts depend on the facts and circumstances of each case. Ibid. Later in this opinion, we consider the unique challenges that incarceration presents. Because the Division is necessarily impeded by the difficulty and possible futility of providing services to an incarcerated person, see, e.g., N.J. Div. of Youth & Family Servs. v. S.A., 382 N.J. Super. 525, 535-36 (App. Div. 2006), reasonable efforts may be satisfied when the Division provides services to, and seeks reunification with, the custodial parent from whom the child was removed. D.M.H., supra, 161 N.J. at 393; see also T.S., supra, 417 N.J. Super. at 242-44 (finding that, because father had no relationship with his daughter prior to incarceration, providing services to him would be futile). Absent an order under N.J.S.A. 30:4C-11.3, the Division may not ignore requests or avoid providing services to an incarcerated parent. See S.A., supra, 382 N.J. Super. at 535-36.

Relevant to this prong is whether appointing another person as the child's KLG is feasible. See N.J.S.A. 3B:12A-6(d). KLG is proper when:

> (1) each parent's incapacity is of such a serious nature as to demonstrate that the parents are unable, unavailable or unwilling to perform the regular and expected functions of care and support of the child;

37

> (2) the parents' inability to perform those functions is unlikely to change in the foreseeable future;
> (3) in cases in which [the Division] is involved with the child as provided in [N.J.S.A] 30:4C-85, (a) [the Division] exercised reasonable efforts to reunify the child with the birth parents and these reunification efforts have proven unsuccessful or unnecessary; and (b) adoption of the child is neither feasible nor likely; and
> (4) awarding kinship legal guardianship is in the child's best interests.
>
> [N.J.S.A. 3B:12A-6(d).]

Unlike a judgment terminating parental rights, KLG does not sever the legal relationship between the child and the parent. N.J. Div. of Youth & Family Servs. v. S.V., 362 N.J. Super. 76, 87 (App. Div. 2003). "[T]he parent remains entitled to visitation and responsible for child support [and] also has the right to seek termination of the guardianship and a resumption of custody if . . . she is [later] able to provide a safe and secure home for the child." Ibid. However, KLG "is not intended as an equally available alternative to termination that must be considered in order to satisfy the third [prong] of N.J.S.A. 30:4C-15.1." Id. at 88. Thus, "when the permanency provided by adoption is available, [KLG] cannot be used as a defense to termination of parental rights." P.P., supra, 180 N.J. at 513.

38

Finally, the fourth prong "serves as a fail-safe against termination even where the remaining standards have been met." E.P., supra, 196 N.J. at 108 (citation and internal quotation marks omitted). The question is

> not whether a [birth] mother or father is a worthy parent, but whether a child's interest will best be served by completely terminating the child's relationship with that parent. It has been "suggested that [a] decision to terminate parental rights should not simply extinguish an unsuccessful parent-child relationship without making provision for . . . a more promising relationship . . . [in] the child's future."
>
> [Ibid. (quoting A.W., supra, 103 N.J. at 610) (alterations in original).]

Thus, a child's need for permanency is an extremely important consideration pursuant to this prong. M.M., supra, 189 N.J. at 281; K.H.O., supra, 161 N.J. at 357-58. The State should offer "testimony of a well qualified expert who has had full opportunity to make a comprehensive, objective, and informed evaluation of the child's relationship" with the natural parents and the foster parents. In re Guardianship of J.C., 129 N.J. 1, 19 (1992).

V.

In applying the legal principles and authorities to the evidence presented at trial, we conclude that the Appellate Division majority erred in reversing the trial court's denial of the Division's application to terminate appellant's parental

39

rights. We emphasize that the standard for termination of parental rights is not any different when the parent is incarcerated. T.S., supra, 417, N.J. Super. at 240-43. The burden of proof does not shift. Ibid. The Division must prove all four prongs by clear and convincing evidence. M.M., supra, 189 N.J. at 280.

Here, with respect to the first prong, the trial court concluded that the Division failed to show by clear and convincing evidence that appellant's incarceration caused harm to Tara. The trial court noted that when appellant was incarcerated in 2004, he believed that Tara was safely in her mother's care and appellant wrote to Tara, although he did not want his daughter to visit him. Additionally, when appellant discovered that Tara was removed from R.G.'s custody, he immediately increased his efforts and contacted Tara to remain a part of her life. Relying on T.S., supra, the panel majority rejected this finding and held "as a matter of law under these facts that [appellant]'s incarceration . . . continues harm to Tara." But, in T.S., supra, the Appellate Division held that because the father had no relationship with his daughter except that she knew her father's name, and because he demonstrated no past parenting proficiency, it was clear that terminating the father's parental rights would not cause more harm than good to the child. 417 N.J. Super. at 242-43.

We conclude that the Appellate Division majority's reliance on T.S. is misplaced. Unlike the father in T.S., who neither parented nor communicated with his child prior to incarceration, appellant parented Tara prior to his incarceration, communicated with R.G. about Tara and K.G.'s well-being prior to their removal from R.G.'s custody, and called and wrote to Tara while in prison. See id. at 242-43; see also L.A.S., supra, 134 N.J. at 143-44 (counseling courts to consider parents' conduct prior to and during incarceration to evaluate extent of harm to child). Thus, the level of harm caused to Tara by appellant's incarceration is distinguishable from the harm caused by the wholly absent father in T.S. See T.S., supra, 417 N.J. Super. at 243. Moreover, the trial court found that the proofs submitted at trial do not substantiate that any crime for which appellant was convicted and incarcerated directly bore on appellant's parental fitness. See L.A.S., supra, 134 N.J. at 141-42.

With respect to prong two, the Appellate Division majority characterized appellant's approval of Tara's placement with the maternal grandmother and his unwillingness to seek custody of Tara at the time of his release from prison as evidence that appellant could not remediate the harm caused to Tara by his incarceration. Significantly, that interpretation suggests that a parent, by virtue of his unwillingness to seek full custody of

41

his child, relinquishes the other parental rights protected by both the United States and New Jersey Constitutions. It is not uncommon, however, for a parent to relinquish custody of his or her children but maintain other parental rights. See V.C. v. M.J.B., 163 N.J. 200, 228 ("visitation rights are almost invariably granted to the non-custodial parent"), cert. denied, 531 U.S. 926, 121 S. Ct. 302, 148 L. Ed. 2d 243 (2000). Thus, the majority overlooked the trial court's finding that appellant credibly recognized that Tara should remain in a safe and stable environment while he reintegrated into society and that he should strengthen his relationship with Tara through visitation and communication. That practical realization should not be equated to relinquishment of parental rights to maintain a parental connection to one's child.

Moreover, because appellant presented evidence that he effectively parented Tara during the first six months of her life, because the Division failed to provide appellant with sufficient services in order to effectuate a successful reunification with Tara upon his release, and because appellant complied with and participated in all court proceedings related to Tara's care, the trial court's finding that the Division failed to prove clearly and convincingly that appellant is unwilling to remediate the harm his incarceration caused to Tara is supported by credible evidence.

42

That said, the Division raises a compelling argument about the harm caused to Tara by delaying her permanent placement and the potential future harm of severing her strong bond with the maternal grandmother pursuant to the second prong of N.J.S.A. 30:4C-15.1(a)(2). See C.S., supra, 367 N.J. Super. at 111. The Division presented expert testimony concluding that a strong bond existed between Tara and her maternal grandmother and that Tara could be psychologically harmed if that bond were disrupted by reintroducing appellant into Tara's life permanently. Moreover, Tara expressed her desire to be adopted by the maternal grandmother, and she is entitled to "a permanent, safe and stable placement." Ibid. However, as the dissent noted, "it cannot be fairly said that the trial court erred as a matter of law, and its findings that the proofs put forth were unconvincing should not be gainsaid. A tie in the convincing power of the proofs does not satisfy the clear and convincing standard." We agree.

Most importantly, the Division failed to meet its burden with respect to the third prong. This Court has repeatedly held that termination of parental rights cases are fact-sensitive and turn on the particular circumstances of each case. See M.M., supra, 189 N.J. at 280. Although this Court has stated that providing services to incarcerated persons is difficult and may be futile, and that the Division is permitted to focus its

43

services on the primary caretaker, the Division should not avoid providing services to all incarcerated persons, regardless of their seeming unwillingness to improve their parental fitness. See D.M.H., supra, 161 N.J. at 393 (explaining that Division may not ignore or disregard non-primary caretaker parent).

Here, the Division paid only cursory attention to appellant from the outset of its involvement with his family. The Division visited appellant once in prison and called him on one other occasion to determine his date of release from prison. The Division arranged two psychological evaluations of appellant but never arranged a bonding evaluation between appellant and Tara. The Division failed to provide appellant with letters from Tara until he complained nearly one-and-one-half years after the Division became involved with the family. The Division never provided appellant with assistance in telephoning his children. Despite knowing that appellant was participating in prison programs and was scheduled to be released from prison shortly after trial, the Division never compared the prison programs' content with programs offered by the Division or attempted to schedule services upon appellant's release.

Even after R.G. failed to comply with the Division's services and relapsed, the Division did not reevaluate what services it could provide to appellant during his incarceration or after his pending release or suggest enrollment in programs

44

while appellant remained incarcerated.  Rather, it abandoned any plan for reunification.  Accordingly, the trial court's finding that "the Division has failed to establish by clear and convincing evidence that reasonable efforts to provide services were made to [appellant]" is entitled to deference, particularly in light of appellant's efforts to seek services while in prison.

We do not suggest that the Division was required to provide any particular services to appellant.  However, we note that in circumstances such as these, particularly when an incarcerated parent's release is imminent, the other parent has relinquished her rights to their child, and the incarcerated parent has expressed a willingness to improve his parenting skills and a desire to deepen his parent-child relationship, the Division must do more than merely speak with the parent and provide two psychological evaluations.  See id. at 390 (explaining that Division should modify services to parents as needs change in particular circumstances).  Amici curiae, ACLU-NJ and NJISJ, suggested several services offered to inmates in other jurisdictions:

> Visitation where appropriate; collect telephone calls; transportation to court proceedings where appropriate; evaluating policies that affect incarcerated parents; promoting healthy relationships with children of the incarcerated and avoiding permanent separation; contacting parents and

45

investigating the history and extent of the parent-child relationship; monitoring parents' progress through corrections counselors or other employees of the jail; inquiring into parent's probable post-release situation and plan; developing and implementing practice memos, operational guidelines and manuals for caseworkers when working with incarcerated parents; and an affirmative obligation to inform incarcerated parents of the Division-involved children of their rights.

We encourage the Division to explore those options with the DOC to determine whether such services are feasible and appropriate for certain incarcerated parents. We leave that determination to the agencies charged with these statutory responsibilities.

Lastly, with respect to prong four's application, we conclude that the appellate majority improperly reversed the trial court's finding. As the Division correctly notes, it is undisputed that the maternal grandmother is able to provide a "permanent safe and stable" living environment; that Tara has a strong bond with her grandmother; and that Tara has expressed a desire to be adopted by her grandmother. Additionally, Dr. Miller opined that Tara had no attachment to appellant, she knew little about him, and had experienced limited interaction with him. Thus, Dr. Miller opined that no bond existed between appellant and Tara.

However, the trial court found that "[Dr. Miller's] conclusions appear to be based on flawed information," and that

46

his characterization of appellant's efforts to maintain a bond with Tara are "contrary to the evidence at trial and should be discounted." Moreover, no bonding evaluation was conducted between appellant and Tara to assist the court in determining whether severing the bond between Tara and appellant would cause more harm than good to Tara. See J.C., supra, 129 N.J. at 19 (recommending expert bonding evaluations of natural parents and foster parents).

Further, the caseworker, the maternal grandmother, and appellant all testified that Tara displayed an affection for or emotional bond with her father. Unlike the daughter in T.S., supra, who only knew her father's name and whose father demonstrated no parenting proficiencies, 417 N.J. Super. at 242-43, in this case there was evidence of a relationship between appellant and Tara. The trial court also credited appellant's testimony that immediately preceding the hearing, Tara told appellant that she loved him and looked forward to spending time with him in the future. Thus, the trial court's findings based on that evidence and his credibility determinations that the Division failed to show by clear and convincing evidence that failure to terminate appellant's parental rights would do more harm than good to Tara was not reversible.

Although we recognize the legitimate interest of Tara in a permanent placement, we conclude from our review of this record

that there was substantial evidence to support the trial court's decision not to terminate appellant's parental rights at the time of trial because it was still uncertain whether severing Tara's bond with her father would cause her more harm than good.

Thus, we hold that the trial court's finding that the Division failed to prove its case by clear and convincing evidence is supported by the trial evidence. Moreover, the trial court did not abuse its discretion by ordering a subsequent hearing to reassess Tara's best interests.

## VI.

The judgment of the Appellate Division is reversed, the decision of the Family Part is reinstated, and the matter is remanded for further proceedings consistent with this opinion. On remand, all options remain on the table for the trial court, i.e., the trial court remains free to enter any other disposition, if current proofs clearly and convincingly show that such a disposition is in Tara's best interests.

CHIEF JUSTICE RABNER; JUSTICES LaVECCHIA, ALBIN, and PATTERSON; and JUDGE CUFF (temporarily assigned) join in JUDGE RODRÍGUEZ's opinion.

48

SUPREME COURT OF NEW JERSEY

NO.  __A-116___                          SEPTEMBER TERM 2011
ON APPEAL FROM  _____Appellate Division, Superior Court_____

NEW JERSEY DIVISION OF YOUTH
AND FAMILY SERVICES,

        Plaintiff-Respondent,
                      v.

R.G.,

        Defendant-Respondent,
                and

J.G.,

        Defendant-Appellant.
_____
IN THE MATTER OF THE
GUARDIANSHIP OF T.G.,
        Minor-Respondent,

              And

K.G.,
        Minor-Respondent.


DECIDED              June 2, 2014
_____
              Chief Justice Rabner                    PRESIDING
_____
OPINION BY          Judge Rodríguez_____
CONCURRING/DISSENTING OPINION BY    _____
DISSENTING OPINION BY    _____

| CHECKLIST | REVERSE/ REINSTATE/ REMAND | |
|---|---|---|
| CHIEF JUSTICE RABNER | X | |
| JUSTICE LaVECCHIA | X | |
| JUSTICE ALBIN | X | |
| JUSTICE PATTERSON | X | |
| JUDGE RODRÍGUEZ (t/a) | X | |
| JUDGE CUFF (t/a) | X | |
| | 6 | |

1