# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-4101-17T2
                A-4103-17T2

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

      Plaintiff-Respondent,

v.

J.S. AND J.C.,

      Defendants-Appellants.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF G.C.
and M.C.,

      Minors.

_____

Argued January 22, 2019 – Decided February 14, 2019

Before Judges Messano and Rose.

On appeal from Superior Court of New Jersey, Chancery Division, Family Part, Bergen County, Docket No. FG-02-0034-17.

Cecilia M.E. Lindenfelser, Designated Counsel, argued the cause for appellant J.S. (Joseph E. Krakora, Public Defender, attorney; Cecilia M.E. Lindenfelser, on the briefs).

Mark E. Kleiman, Designated Counsel, argued the cause for appellant J.C. (Joseph E. Krakora, Public Defender, attorney; Mark E. Kleiman, on the briefs).

Natasha C. Fitzsimmons, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Jason W. Rockwell, Assistant Attorney General, of counsel; Natasha C. Fitzsimmons, on the brief).

Toya Davis, Designated Counsel, argued the cause for minors (Joseph E. Krakora, Public Defender, Law Guardian, attorney; Toya Davis, on the brief).

PER CURIAM

In these consolidated appeals, defendants J.S. (mother) and J.C. (father) appeal from an April 27, 2018 judgment terminating their parental rights to two of their biological children, G.C., born in October 2014, and M.C., born in December 2015, and granting guardianship of the children to the Division of Child Protection and Permanency (Division). Defendants contend the Division failed to prove all four prongs of N.J.S.A. 30:4C-15.1(a) by clear and convincing evidence. The Law Guardian supports the termination on appeal as it did before the trial court.

In a comprehensive seventy-six-page written opinion, Judge William R. DeLorenzo, Jr. found the Division satisfied the four-prong test by clear and convincing evidence, and held that termination was in the children's best interests.  In re Guardianship of K.H.O., 161 N.J. 337, 347-48 (1999).  Based on our review of the record and applicable law, we are satisfied the evidence in favor of the guardianship petition adequately supports the termination of defendants' parental rights.  See N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 279 (2007) (holding that a reviewing court should uphold the factual findings regarding the termination of parental rights if they are supported by substantial and credible evidence in the record as a whole).  Accordingly, we affirm.

I.

The guardianship trial spanned four days in November and December 2017.  The Division moved into evidence more than forty documents and presented testimony from two caseworkers and a licensed psychologist, Frank J. Dyer, Ph.D.  Defendants did not testify, but J.S. presented the testimony of her mother, T.S.

The evidence adduced at the trial is set forth at length in Judge DeLorenzo's opinion and need not be repeated in the same level of detail here.

A-4101-17T2

Instead, we incorporate by reference the judge's thorough factual findings and recount the most significant evidence to lend context to the judge's legal conclusions.

The precipitating event that led to the guardianship complaint involved J.C. and N.P., the then six-year-old biological son of J.S. At that time, the household was comprised of J.C., J.S., T.S., N.P., and D.S., the then seven-year-old biological son of J.S.[1] G.C., then three months old also resided in the home; M.C. was not yet born.

Specifically, in January 2015, the Division received a referral, reporting N.P. arrived at school with bruises on his head, back, and arms. N.P. told the school nurse that his "stepdad" caused the injuries. During a follow-up interview with the Bergen County Prosecutor's Office (BCPO), N.P. explained that "he was supposed to get ready for school and instead he was playing around . . . [when J.C.] told him to shut his mouth, threw him in the closet, dragged him

---

[1] During the pendency of the present proceedings, N.P. and D.S. were placed in the custody of their respective biological fathers. At oral argument before us, counsel advised that N.P. remains in the sole custody of his father, and D.S. is in the custody of the Division, which has filed guardianship proceedings on his behalf. N.P., D.S., and their biological fathers are not parties to this appeal. J.C. is the biological father of four older children, all of whom are in their biological mothers' custody, and also are not parties to this appeal.

out of the closet onto the floor . . . [and] threw him toward the bunk beds[,]" causing N.P. to hit his head. J.C. was arrested and charged with second-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a).[2]

The following day, J.S. contacted the BCPO, claiming N.P. recanted his statement. J.S. told Division workers that "[N.P. had] lied and by him [now] telling the truth [J.C.] can get released [from jail]." However, during his second statement to the BCPO, N.P. maintained that J.C. caused his injuries.

Thereafter, the Division implemented a safety protection plan (SPP) restraining J.C. from unsupervised contact with G.C. and D.S. Because J.C. had been ordered to refrain from contact with N.P. in the criminal proceedings, N.P. was not included in the SPP. Notwithstanding the no-contact provisions, J.S.

---

[2] According to a Division report, in January 2017, defendant pled guilty to "child endangerment and abandonment" and was sentenced to a probationary term of one year. However, the judgment of conviction was not entered in evidence at the guardianship trial and, as such, is not contained in the appellate record. Notwithstanding his guilty plea, defendant maintained his innocence throughout the guardianship proceedings, claiming he pled guilty to a lesser offense to avoid risking a lengthy prison sentence if convicted at trial, and thereby losing "his babies[,]" G.C. and M.C.

permitted J.C. into the home on several occasions, prompting the Division to conduct a Dodd removal[3] of N.P., D.S. and G.C.

Nine months later, J.S. gave birth to M.C., but declined to provide the hospital with any information concerning the child's father. J.S. initially informed the Division she was acting as a surrogate for a friend, but later acknowledged the possibility that J.C. was M.C.'s father. The Division executed a Dodd removal of M.C. the day after her birth, and was granted custody following a hearing on December 22, 2015. DNA testing determined J.C. is M.C.'s father.

During the ensuing months, the Division provided a multitude of services to both defendants, including parenting classes, mental health evaluations and treatment, and supervised parenting time. Indeed, for seven months, the judge who conducted the Title Nine abuse and neglect proceedings rejected the Division's permanency plan to ensure proper services were provided to J.S. Although defendants availed themselves of services, they were unable to eliminate the risk of harm to G.C. and M.C. Thereafter, the Title Nine judge

---

[3] A Dodd removal is an emergent removal of a minor without a court order pursuant to N.J.S.A. 9:6-8.21 to -8.82, known as the Dodd Act. N.J. Div. of Youth & Family Servs. v. P.W.R., 205 N.J. 17, 26 n.11 (2011).

approved the Division's plan for permanency, and the Division filed a complaint for guardianship on October 24, 2016.

Based on the evidence adduced at the guardianship trial, Judge DeLorenzo aptly analyzed each prong of the best interests test, and gave careful attention to the importance of permanency and stability for the children. In doing so, the judge made detailed credibility findings, determining the Division's witnesses were believable. In particular, the judge credited the expert opinion of Dr. Dyer, who performed the psychological evaluations of J.S. and J.C. and bonding evaluations of the children with defendants and their resource parent. Conversely, the judge determined T.S., who opined that J.S. was capable of safely and properly caring for her children, was clearly biased in favor of her daughter. Ultimately, the judge concluded it was in the best interests of G.C. and M.C. to terminate defendants' parental rights. These appeals followed.

## II.

It is well settled that parents have a fundamental right to raise their children, and that right is constitutionally protected. N.J. Div. of Youth & Family Servs. v. G.L., 191 N.J. 596, 605 (2007). "[T]erminations should be granted sparingly and with great caution because they irretrievably impair imperative constitutionally-protected liberty interests and scores of centuries of

7

societal family constructs." N.J. Div. of Youth & Family Servs. v. R.G., 217 N.J. 527, 553 (2014) (citation omitted). However, a parent's rights are not absolute. Ibid. "Because of its parens patriae responsibility, the State may terminate parental rights if the child is at risk of serious physical or emotional harm or when necessary to protect the child's best interests." Id. at 553-54 (citing N.J. Div. of Youth & Family Servs. v. A.W., 103 N.J. 591, 599 (1986)).

In order for the court to terminate parental rights, the Division must satisfy the following four prongs of the "best interests of the child" test by clear and convincing evidence:

> (1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child;
>
> (3) The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and

8

(4) Termination of parental rights will not do more harm than good.

[N.J.S.A. 30:4C-15.1(a)(1)-(4).]

The four prongs are not independent of one another. Rather, they "are interrelated and overlapping[,] . . . designed to identify and assess what may be necessary to promote and protect the best interests of the child." State, Div. of Youth & Family Servs. v. R.L., 388 N.J. Super. 81, 88 (App. Div. 2006). Parental fitness is the crucial issue. K.H.O., 161 N.J. at 348. Determinations of parental fitness are very fact sensitive and require specific evidence. Ibid. Ultimately, "the purpose of termination is always to effectuate the best interests of the child, not the punishment of the parent." Id. at 350.

Our appellate review of Judge DeLorenzo's decision is limited. R.G., 217 N.J. at 552. We are bound to accept his factual findings, as long as they are "supported by adequate, substantial, and credible evidence." Ibid. (citing N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 104 (2008)). Additionally, we accord his decision particular deference "[b]ecause of the family courts' special jurisdiction and expertise in family matters," and because the judge was uniquely in a position to evaluate the credibility of the witnesses. Cesare v. Cesare, 154 N.J. 394, 412-13 (1998). However, we review the trial court's legal interpretations de novo. R.G., 217 N.J. at 552-53.

Having reviewed the record in light of those legal standards, we conclude Judge DeLorenzo's factual findings are supported by substantial credible evidence in the record, and the legal conclusions drawn therefrom are indisputable.  See N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J. 420, 448-49 (2012).  Consequently, we are obligated to defer to his findings.  Ibid. We therefore affirm substantially for the reasons expressed by the judge in his well-reasoned opinion.  We add only the following comments, addressing those arguments that are pertinent to these appeals.

We first consider defendants' overlapping arguments that the judge's findings were insufficient to establish the first prong of the best interests test. In particular, J.S. contends she did not cause her children any actual harm, and J.C.'s conduct against N.P. was an "isolated incident."  J.C., in turn, argues that, in determining J.C. engaged in excessive corporal punishment of N.P., the judge improperly relied on the findings by the judge in the Title Nine action, which only required proof by the lower preponderance-of-the-evidence standard.  He maintains N.P. did not sustain injuries to support a finding of excessive corporal punishment.

Defendants' focus on the "actual harm" component of prong one is misplaced.  Indeed, it is well settled that the Division need not demonstrate

actual harm to satisfy prong one. <u>N.J. Div. of Youth & Family Servs. v. A.G.</u>, 344 N.J. Super. 418, 440 (App. Div. 2001). The focus under the first prong is not on any "single or isolated harm," but rather on "the effect of harms arising from the parent-child relationship over time on the child's health and development." <u>K.H.O.</u>, 161 N.J. at 348 (citing <u>A.W.</u>, 103 N.J. at 604-10). The harm may be established by "a delay in establishing a stable and permanent home." <u>In re Guardianship of D.M.H.</u>, 161 N.J. 365, 383 (1999).

As the judge aptly recognized here, "the safety, health and development of the children [were] endangered at the time of their removal by the Division and will continue to be endangered as a result of the failure by . . . [d]efendant[s] . . . to remediate their parental deficits." The judge's determination was therefore grounded in defendants' inability to provide a safe, stable and permanent home for G.C. and M.C. The record evidence supports the judge's conclusion.

As to J.S., the judge cited Dr. Dyer's opinion that J.S.'s pattern of deceptive behavior, lack of insight into her children's needs, and "subordinat[ing] her interest, and those of the children, to J.C.['s] . . . present[ed] a risk of future harm to the children." For example, J.S. permitted J.C. into the family home in violation of court-ordered no-contact provisions, attempted to

influence N.P. to recant his statement about J.C.'s abuse, and lied about surrogating M.C. for a friend.

As to J.C., the judge properly relied on Dr. Dyer's opinion that J.C. "posed a risk to the children due to his paranoid and antisocial behaviors coupled with his low threshold for aggressive behavior."  Dr. Dyer's opinion was soundly supported by J.C.'s refusal to accept responsibility for injuring N.P., despite his guilty plea, and J.C.'s refusal to acknowledge his anger management issues and his need for psychotherapy.  Indeed, J.C. acknowledged

> that he has a history of incarceration for violent offenses including a "threat to kill" in 2006 for which he served three years in prison, a simple assault and disorderly persons act in 2000 as well as [a] domestic violence incident for which he attended anger management services.  J.C. also served a seven[-]year prison term for assaulting his girlfriend at the time.

Accordingly, Dr. Dyer concluded, "In light of [J.C.'s] lengthy history of physically aggressive and erratic behavior, his poor response to previous psychological and psychiatric services, and his adamant denial of any need for treatment, his prognosis for positive change is regarded as extremely poor."

Further, there is clear and convincing evidence in the record to support the judge's finding that J.C. engaged in excessive corporal punishment of N.P. In particular, then six-year-old N.P. gave two consistent statements to the

BCPO, despite J.S.'s attempts to persuade him to change his account. That account was corroborated by physical manifestations of injury to the child. Nor are we persuaded by J.C.'s argument that he pled guilty to child endangerment on pragmatic grounds where, as here, the record is devoid of any evidence that he challenged his conviction by filing a motion to vacate his guilty plea, a post-conviction relief petition, or an appeal of his conviction.

We next consider J.S.'s argument that she availed herself of services, enabling her to provide a safe and stable home for the children. To support her contention, she claims the trial judge erroneously attributed greater weight to Dr. Dyer's opinions than to the findings of her therapist, Jeremy Sacher, a licensed clinical social worker.

It is undisputed that defendants engaged in services provided by the Division. Indeed, the Division's permanency plan initially was rejected by the judge in the Title Nine action on multiple return dates, thus affording J.S. "the benefit of approximately seven months of additional therapeutic and psychiatric services" that were tailored to her cognitive limitations. Relying on Dr. Dyer's unrefuted expert testimony and his thirty-two page comprehensive evaluation of the family, Judge DeLorenzo determined J.S. failed to sufficiently benefit from those services. Because J.S. was unable to "acquire insight" and "grasp the

A-4101-17T2

essential issues" in therapy, Dr. Dyer determined her prognosis for positive change in her parenting ability was "poor."

Conversely, Sacher, who did not testify at trial, provided brief one-page updates to the Division during the course of J.S.'s treatment. For example, six months after the guardianship complaint was filed, Sacher indicated J.S. "is now able to see that her children's well[-]being is of the utmost importance." However, his update provided no indication that it would be safe to return the children to J.S. Further, J.S.'s treatment with Sacher was inconsistent: within three months of that report, Sacher closed J.S.'s file for failure to attend sessions, although she later resumed therapy.

Finally, J.C. contends the Division failed to properly consider his aunt and uncle (M family) as a source of placement for the children. Although the M family was committed to adopting G.C.,[4] they did not complete the licensing process. In February 2016, the Division closed its file, but failed to send a formal "rule out" letter to the M family, advising them of their noncompliance with the required home study. Accordingly, Judge DeLorenzo acknowledged the Division deprived the M family "of the opportunity to have the Division

---

[4] When the M family was first named as a resource, M.C. was not yet born. It is unclear from the record whether their visits with the children were limited to G.C.

review its actions."  However, the Division's admitted failure to issue a rule-out letter, see N.J.S.A. 30:4C-12.1(b), does not warrant jeopardizing the safety of the children or their entitlement to permanency without further delay.  See N.J. Div. of Youth & Family Servs. v. K.L.W., 419 N.J. Super. 568, 581 (App. Div. 2011) ("Delay of permanency or reversal of termination based on the Division's noncompliance with its statutory obligations is warranted only when it is in the best interests of the child.").

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION