# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1790-18T3

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

    Plaintiff-Respondent,

v.

K.W.,

    Defendant-Respondent,

and

G.R., JR.,

    Defendant-Appellant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF I.R.,

    a Minor.

_____

Submitted December 2, 2019 – Decided December 24, 2019

Before Judges Moynihan and Mitterhoff.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Monmouth County, Docket No. FG-13-0051-17.

Joseph E. Krakora, Public Defender, attorney for appellant, G.R., Jr. (Robyn A. Veasey, Deputy Public Defender, of counsel; James Daniel O'Kelly, Designated Counsel, on the brief).

Gurbir S. Grewal, Attorney General, attorney for respondent (Melissa H. Raksa, Assistant Attorney General, of counsel; Salima E. Burke, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor (Meredith Alexis Pollock, Deputy Public Defender, of counsel and on the brief).

PER CURIAM

Defendant G.R., Jr. (Gary) appeals from an order, entered after a five-day trial, terminating parental rights to his daughter, I.R. (Ivette), who was born in December 2010.[1] The Division of Child Protection and Permanency (the Division) removed Ivette from the care of her mother, K.W. (Karen) and subsequently commenced this action against both parents.[2] The Division

---

[1] We use pseudonyms throughout this opinion to protect the privacy of the children and parties, and preserve the confidentiality of these proceedings. R. 1:38-3(d)(12). Our use intends no disrespect or familiarity.

[2] Karen's parental rights were terminated in December 2015. She did not appeal that order.

simultaneously removed Karen's other children, H.M. (Harper), M.D. (Mark) and L.W. (Laura).[3]

Gary argues the trial judge erred in finding the Division proved the first, second and third statutory factors used in determining parental-rights termination petitions. N.J.S.A. 30:4C-15.1(a). He asserts the trial court's opinion is "devoid of any reference to a controlling statute or case law," and contains no "relevant specific legal conclusions" relating to the many facts it found. He also avers "the trial court failed to reference the second and third prongs in its oral opinion or identify the facts that established satisfaction of those prongs – by clear and convincing evidence."

We apply our limited standard of review, upholding "the trial court's factual findings . . . when supported by adequate, substantial, and credible evidence[,]" and "defer[ring] to the trial court's credibility determinations," yet reviewing de novo, without "'any special deference,'" the "'trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference.'" <u>N.J. Div. of Youth & Family</u>

---

[3] Harper was placed with her father and is not involved in this appeal. Laura's father surrendered his parental rights, and the trial court terminated Mark's father's parental rights after entering a default and holding a proof hearing. Neither father filed an appeal.

Servs. v. R.G., 217 N.J. 527, 552-53 (2014) (quoting Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)). Although the trial court's findings of fact and conclusions of law were anomalously terse, we affirm. See R. 1:7-4(a).

Parents have a constitutionally protected right to the care, custody and control of their children. Santosky v. Kramer, 455 U.S. 745, 753-54 (1982); In re Guardianship of K.H.O., 161 N.J. 337, 346 (1999). "The rights to conceive and to raise one's children have been deemed 'essential,' 'basic civil rights . . .,' and '[r]ights far more precious . . . than property rights.'" Stanley v. Illinois, 405 U.S. 645, 651 (1972) (third alteration in original) (citations omitted). "[T]he preservation and strengthening of family life is a matter of public concern as being in the interests of the general welfare[.]" N.J.S.A. 30:4C-1(a); see also K.H.O., 161 N.J. at 347.

The constitutional right to a parental relationship, however, is not absolute. R.G., 217 N.J. at 553; N.J. Div. of Youth & Family Servs. v. A.W., 103 N.J. 591, 599 (1986). At times, a parent's interest must yield to the State's obligation to protect children from harm. N.J. Div. of Youth & Family Servs. v. G.M., 198 N.J. 382, 397 (2009); In re Guardianship of J.C., 129 N.J. 1, 10 (1992). To effectuate these concerns, the Legislature created a four-prong test

4                                                              A-1790-18T3

for determining when a parent's rights must be terminated in a child's best interests. N.J.S.A. 30:4C-15.1. N.J.S.A. 30:4C-15.1(a) requires that the Division prove by clear and convincing evidence:

> (1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm . . . .;
>
> (3) The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and
>
> (4) Termination of parental rights will not do more harm than good.
>
> [See also A.W., 103 N.J. at 604-11.]

Gary does not challenge the trial judge's finding regarding the fourth prong: the Division established termination of his parental rights will not do more harm than good. N.J.S.A. 30:4C-15.1(a)(4). We, therefore, examine the evidence that supports the judge's findings on the first three prongs.

Gary's argument that the trial court's findings regarding the first prong were insufficient to establish that he abandoned Ivette under N.J.S.A. 30:4C-

15.1(b)(1) and N.J.S.A. 30:4C-15(d), lacks sufficient merit to warrant discussion in this opinion.[4]   R. 2:11-3(e)(1)(E).   Although the Division alleged abandonment under those statutes in its complaint for guardianship, the sole theory it advanced at trial was the best interests standard under N.J.S.A. 30:4C-15.1(a).

To establish prong one under that statute—"[t]he child's safety, health, or development has been or will continue to be endangered [or harmed] by the parental relationship[,]"  N.J.S.A. 30:4C-15.1(a)(1)—the Division "must show that the alleged harm 'threatens the child's health and will likely have continuing deleterious effects on the child.'"  N.J. Div. of Youth and Family Servs. v. F.M.,

---

[4]  The Division must commence "a petition to terminate parental rights" if

> for a period of six or more months . . . the parent, although able to have contact, has had no contact with the child, the child's resource family parent or the [D]ivision . . . and . . . the parent's whereabouts are unknown, notwithstanding the [D]ivision's reasonable efforts to locate the parent.
>
> [N.J.S.A. 30:4C-15.1(b)(1)(a)-(b)].

Similarly, a petition must be filed if the parent, after the removal and acceptance or placement of the child by the Division, "fail[s] for a period of one year to remove the circumstances or conditions that led to the removal or placement of the child, although physically and financially able to do so, notwithstanding the [D]ivision's reasonable efforts to assist the parent . . . in remedying the conditions." N.J.S.A. 30:4C–15(d).

A-1790-18T3

211 N.J. 420, 449 (2012) (quoting K.H.O., 161 N.J. at 352). "To satisfy this prong, [the Division] does not have to wait 'until a child is actually irreparably impaired by parental inattention or neglect.'" Ibid. (quoting In re Guardianship of D.M.H., 161 N.J. 365, 383 (1999)). "Serious and lasting emotional or psychological harm to children as the result of the action or inaction of their biological parents can constitute injury sufficient to authorize the termination of parental rights." In re Guardianship of K.L.F., 129 N.J. 32, 44 (1992). In fact, a "parent's withdrawal of [his or her] solicitude, nurture, and care for an extended period of time is in itself a harm that endangers the health and development of the child." D.M.H., 161 N.J. at 379. In evaluating this prong, courts are also "mindful of strong policy considerations that underscore the need to secure permanency and stability for the child without undue delay." Id. at 385. And, a parent's failure to provide a permanent, safe, stable home for a child is a harm in and of itself. N.J. Div. of Youth & Family Servs. v. C.S., 367 N.J. Super. 76, 111 (App. Div. 2004); N.J. Div. of Youth & Family Servs. v. B.G.S., 291 N.J. Super. 582, 591-92 (App. Div. 1996).

The evidence supports the trial court's conclusion that Gary harmed Ivette by absenting himself for an extended period after her removal by the Division, at which time he was not even considered a placement option because he had a

child endangerment conviction and refused to comply with the terms of a safety protection plan implemented by the Division. Indeed, Gary testified at trial that he could not care for Ivette at that time.

Gary did not visit with Ivette from December 2015 through January 2018. Despite efforts by the Division to find him—including database searches, caseworker visits, letters and telephone calls—his whereabouts were unknown for a substantial period, and the Division considered him "missing." In May 2017, the trial court relieved the Division of its efforts to locate and contact Gary until such time that he contacted the Division.

Furthermore, he declined to work with the Division or provide an address for assessment as a suitable home for Ivette. When offered the opportunity for therapeutic visitation with Ivette, Gary missed the first two intake appointments in December 2017 and, despite letters and texts from the Division to reschedule, Gary did not respond and finally appeared for intake on January 17, 2018.

Although present at the removal hearing in December 2015, Gary absented himself from Ivette's life for about two years. The trial court found incredible Gary's contention that he thought Karen was caring for Ivette. It also found that Gary "chose one family over another" inasmuch as he was living with

A-1790-18T3

his wife and their children. And even when he began therapeutic visitation with Ivette, he was not consistent with scheduled visits.

Dr. David Brandwein, an expert in the field of psychology, conducted a psychological evaluation of Gary in June 2018. He testified at trial of his concern about Gary's absence from Ivette's life, stating, "that's not an inconsequential amount of time, that's a long time to a child . . . [t]o be basically, physically and psychologically absent from her life." He expressed that Gary only "decided to step to the plate when his parental rights were at risk, not during the earlier period of [the] case" when Ivette was in resource care. Brandwein summarized his findings:

> This is not somebody who has a personality disorder who – that would make them unable to care for children. The question here is really [Ivette]. What is the impact that his absence had on [Ivette], both physically and psychologically. And what [Gary] – I'm trying to find the right word – unwittingly, he didn't mean to let happen in that interim time period, which is that [Ivette] found, along with her siblings, a pre-adoptive home, with foster parents that have been caring for her for quite some[]time, and that she has built quite a strong relationship with.

Brandwein found most compelling "the bond [Ivette] had with her resource parents and the bonds [Ivette] has with her siblings." He opined, despite Gary's positive relationship with Ivette, "too much time has passed," and

"the impact of engaging in zero efforts to be reunified with this child for . . . months" contraindicated reunification with Gary. Brandwein also expressed concern over Gary's inconsistent therapeutic visits.

Brandwein testified Gary's extended absence contributed to the formation of a bond between Ivette and her resource parents and further contributed to Ivette's bond with Laura and Mark. He also opined Ivette would suffer serious and enduring harm if she were removed from her resource parents' care or from Laura and Mark. And, that if these bonds were broken, Gary would not be able to remedy the harm.

Brandwein also testified that Ivette would experience harm if there is a continued delay in permanent placement. He concluded Gary "basically abandoned his child to the care of the [D]ivision. And that is something very serious and significant," and that termination would not do more harm than good here, because Ivette's most secure psychological bonds are with her resource parents and her siblings, Laura and Mark.

Dr. Alan Lee, an expert in the field of psychology, conducted psychological evaluations of Gary in June 2017 and July 2018, and bonding evaluations of Gary and Ivette in July 2018, Ivette and her resource parents in July 2017 and July 2018, and Ivette and her siblings in August 2017 and July

10

2018. Lee testified at trial that Gary could not provide Ivette with the stable, positive bond that she needs. He also opined Ivette had formed a significant and positive bond with her resource parents, who were willing to adopt Ivette together with Mark and Laura, both of whom were also living with the resource parents, and with whom Lee found Ivette had formed a significant and positive bond. Lee also opined there was a significant risk that Ivette would suffer severe and enduring psychological or emotional harm if her relationship with her resource family ended.

Gary's withdrawal from Ivette's life for many months, and his failure to offer a safe and stable home in Ivette's hour of need, posed harm to Ivette's safety, development and well-being. We note Ivette was being treated for trauma, after being diagnosed with adjustment disorder, child neglect, attention deficit disorder and oppositional defiant disorder. Gary was nowhere to be found while Ivette suffered through this period. We further consider Ivette's need for permanency, and Gary's failure to provide same, in determining there was sufficient evidence to support the trial court's finding that the Division had presented clear and convincing evidence to establish the first statutory prong.

Gary argues the trial court failed to "make explicit prong two findings" and its "passing" conclusion that Gary "did not comply with services and when

he did, he completed the services 'he wanted to do[,]'" was not based on substantial, credible record evidence, because Gary did complete services.

Our Supreme Court has recognized the second statutory prong focuses not on whether the parents "are themselves unfit or whether they are the victims of social circumstances beyond their control," but on "whether it is reasonably foreseeable that the parents can cease to inflict harm upon the children entrusted to their care." A.W., 103 N.J. at 607. "Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child." N.J.S.A. 30:4C-15.1(a)(2). "[T]he inquiry centers on whether the parent is able to remove the danger facing the child." F.M., 211 N.J. at 451. The Court cautioned that "the price of focusing on the plight of the parents . . . is that the child is kept in waiting for what the decision-makers view as the ideal or best placement." A.W. 103 N.J. at 601-02. What most concerned the A.W. Court was the lack of evidence of "any realistic likelihood that the parents would ever be capable of caring for the children." Id. at 614. Even when parents are not blameworthy because they were "shortchanged by either nature or society," this prong is satisfied when their behavior "indicates a further likelihood of harm to the child in the future." Id. at 615-16.

The trial court found the Division proved Gary was unwilling or unable to eliminate the harm caused by Ivette's lack of permanency and stability. The court cited Gary's initial refusal to engage with the Division, and his subsequent failure to fully comply with services, as raising "serious concerns regarding his ability to care for this child at this time," and noted Gary avoided telling the Division where he lived.

Although Gary eventually complied with services the Division offered—except individual counseling—his participation, as noted by Brandwein, was inconsistent, and his prolonged absence from Ivette's life was telling evidence that he was unwilling or unable to both eliminate the harm she faced and provide a safe and stable home for her. Furthermore, Lee found Gary's parenting knowledge and childrearing skills to be limited and advised against Gary serving as an independent caretaker for the foreseeable future. Brandwein was concerned about Gary's failure to appreciate the impact if Ivette was removed from her resource parents and siblings. Even Gary's psychological expert, Dr. Gerard Figurelli, was concerned about Gary's ability to parent adequately over a sustained period of time, given Gary's lack of consistent compliance with therapeutic visitation, and its impact on Ivette.

A-1790-18T3

Moreover, as the trial court found, crediting Lee's and Brandwein's testimony—and disbelieving Figurelli's expert testimony—it "didn't make sense that denying permanency to this child, after being at a placement for three years, could possibly be in her best interest." The court also found it would cause more harm than good to separate Ivette from her resource parents and her siblings, recognizing Ivette's need for permanency.

Notwithstanding Gary's compliance with most of the Division's services, the experts' views that he was not yet ready to assume Ivette's care, and his dilatory actions that impacted on Ivette's sense of permanency, supported the trial court's conclusion that the Division met its burden regarding the second prong.

Finally, Gary argues the Division did not make reasonable efforts to provide services designed to reunite him with Ivette, and failed to consider his sister-in-law and her mother as alternatives to termination so as to satisfy prong three.

The third prong requires the Division to undertake "reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home" and requires the court to consider

14

"alternatives to termination of parental rights."  N.J.S.A. 30:4C-15.1(a)(3).

Reasonable efforts are defined in N.J.S.A. 30:4C-15.1(c) as

> attempts by an agency authorized by the [D]ivision to assist the parents in remedying the circumstances and conditions that led to the placement of the child and in reinforcing the family structure, including, but not limited to:
>
> (1) consultation and cooperation with the parent in developing a plan for appropriate services;
>
> (2) providing services that have been agreed upon, to the family, in order to further the goal of family reunification;
>
> (3) informing the parent at appropriate intervals of the child's progress, development and health; and
>
> (4) facilitating appropriate visitation.

"Reasonable efforts depend on the facts and circumstances of each case." R.G., 217 N.J. at 557, and "may include consultation with the parent, developing a plan for reunification, providing services essential to the realization of the reunification plan, informing the family of the child's progress, and facilitating visitation," N.J. Div. of Youth and Family Servs. v. M.M., 189 N.J. 261, 281 (2007).  "The emphasis here is on the steps taken by [the Division] toward the goal of reunification." F.M., 211 N.J. at 452.  "'The diligence of [the Division]'s

efforts on behalf of a parent is not measured by' whether those efforts were successful." Ibid. (quoting D.M.H., 161 N.J. at 393).

This prong also requires that the court consider alternatives to the termination of parental rights. N.J.S.A. 30:4C-15.1(a)(3). The statute "does not permit the Division to embark on a course set for termination of parental rights and adoption by a foster parent without at least first exploring available relative placements." N.J. Div. of Youth & Family Servs. v. K.L.W., 419 N.J. Super. 568, 580 (App. Div. 2011); see also N.J.S.A. 30:4C-12.1. An important objective of the statutory scheme is "prompt identification of relatives and notice to them of the results of the investigation and the potential for termination if the child remains in foster care." Ibid.

We find no merit in these arguments. The Division offered a number of services with the goal of reunifying Gary and Ivette. We also note the Division regularly sought to contact Gary. Nonetheless, Gary was subsequently provided with therapeutic visits, a substance abuse evaluation, urine screens, psychological evaluations, domestic violence classes, parenting classes, and individual therapy. He withdrew from individual therapy based on his belief that it was unnecessary, and he inconsistently participated in therapeutic

16

visitation. As the trial court found, "[h]e did the services he wanted to do" but did not demonstrate that "his number one priority was getting [Ivette] back."

We determine Gary's argument, relying on Lee's mention that some enumerated services were for Gary's personal benefit, to be without sufficient merit to warrant discussion here. R. 2:11-3(e)(1)(E). Gary had to address his own problems, as found by the expert, before he could act as a proper caretaker for Ivette, especially considering the trauma she endured. Again, the Division provided therapeutic visitation in an effort to reunite father and daughter, a program with which he did not faithfully comply.

We, likewise, find insufficient merit in Gary's argument the Division failed to consider his sister in law, M.R. (Mary), or her mother, S.S. (Susan), when he allegedly proposed them as placement options for Ivette during the removal hearing in December 2015. The Division kept all three children together when it placed them with A.B. (Anna)—whose husband is related to Gary, and who was familiar with the family on December 15, 2015—prior to the children's placement with the resource parents.

Mary, a former Division employee, testified at trial that she volunteered to serve as a placement option for Ivette in August 2017, but that she would not be willing to care for all three children. On August 10, 2017, the Division sent

a letter to Mary ruling her out as a placement option for Ivette on a best-interests basis because it was "determined by a psychologist that removal from [the resource home] and her siblings that she is placed with would be detrimental to [Ivette]." Mary had previously agreed that she did not want to disrupt Ivette's placement. She confirmed during her testimony that she was ruled out as a placement option but did not seek to appeal that determination.

Susan testified she was a licensed foster parent and in December 2015 was willing to serve as a long-term placement for Ivette. But, as of the time of trial, she was no longer able to serve as a placement option, and she was uncertain in 2015 whether she would have been able to accommodate Ivette's siblings.

Adoption supervisor Heather Delapa testified on behalf of the Division, consistent with the documentation in the record regarding possible placements for Ivette, that Susan was a resource parent for the Division and also Gary's sister-in-law's mother. She was ruled out as a placement for Ivette, as well as for Laura and Mark, because she was not willing to care for the children in her home. Susan reiterated this position immediately before trial.

The trial court found the Division reasonably considered other placement options, including Mary and Susan. The court found the Division's rule-out of

A-1790-18T3

Mary was reasonable in light of Ivette's best interests, because Ivette had developed bonds in her resource home and should not be separated from her resource parents and siblings. Further, Mary could not take all three children. The court also found Susan's testimony that she could have taken Ivette in December 2015, lacked credibility and was "a little bit all over the place" because she was not clear whether she would have taken Ivette alone, or all the siblings together.

The children stayed with Anna until a change in conditions at her home necessitated movement of the children, ultimately to the resource home where they currently reside. There is clear and convincing evidence the Division fulfilled its role to consider alternatives to termination.

We find insufficient merit in the remainder of Gary's arguments to warrant any discussion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1790-18T3