# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1092-21

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

    Plaintiff-Respondent,

v.

C.I.,

    Defendant-Appellant,

and

J.M.,

    Defendant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF
D.D.M., a minor.

_____

Submitted September 19, 2022 – Decided October 11, 2022

Before Judges Currier and Enright.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Atlantic County, Docket No. FG-01-0024-21.

Joseph E. Krakora, Public Defender, attorney for appellant (Christine Olexa Saginor, Designated Counsel, on the briefs).

Matthew J. Platkin, Acting Attorney General, attorney for respondent (Sookie Bae-Park, Assistant Attorney General, of counsel; Julie B. Colonna, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Todd Wilson, Designated Counsel, on the brief).

PER CURIAM

Defendant C.I. (Carol)[1] appeals from the November 19, 2021 judgment terminating her parental rights to her biological son, D.D.M. (David), following a seven-day guardianship trial.[2] We affirm.

---

[1] We refer to defendants, their son, and other adults involved in this litigation by their initials and fictitious names, to protect their privacy. R. 1:38-3(d)(12).

[2] Although the trial court also terminated the parental rights of David's father, defendant J.M. (John), following the guardianship trial, John does not appeal from the guardianship judgment. Accordingly, we limit our discussion to the facts leading to the termination of Carol's parental rights.

I.

We do not repeat the facts at length because they are fully detailed in the trial judge's opinion. Instead, we provide a summary of the evidence adduced during the guardianship trial.

In May 2019, the Division of Child Protection and Permanency (Division) received a referral from the childbirth center where Carol had delivered David two days earlier. During its investigation, the Division interviewed Carol, who disclosed she had been diagnosed with paranoid schizophrenia and major depression. She also revealed she had suicidal ideations in 2001 − when she heard voices telling her to jump in front of a train. But she refused to elaborate about the nature of her auditory hallucinations. Further, Carol acknowledged she was hospitalized multiple times for her illnesses.

Due to the Division's concerns about Carol's mental health, how her condition could jeopardize David's safety, and its inability to identify a supervisor who could oversee Carol's care of her newborn, the Division removed David and placed him in a resource home with E.F. (Ellen) and her spouse, A.F. (Alex). Although David was subsequently placed with another resource family for a short period of time, he returned to Ellen's and Alex's home and remained there throughout the remainder of the litigation.

A-1092-21

In June 2019, at the Division's request, Carol submitted to a psychiatric evaluation. During the evaluation, she reported a history of suicidal ideations, suicide attempts, psychosis and delusions. The evaluator recommended Carol take psychotropic medication to regulate her mood and diminish her psychiatric symptoms. Carol did not consent to this treatment. The evaluator also recommended Carol engage in individual therapy and take parenting training classes. Although the Division made referrals for these services, Carol refused to engage with the Division's recommended providers. Instead, she participated in therapy every few weeks for an unspecified amount of time and attended a three-hour parenting class which was not approved by the Division. Carol denied the Division access to information from her treatment providers, thereby hampering its efforts to assess whether Carol was progressing in her ability to safely parent David.

Following David's placement with his resource parents, the Division asked Carol to authorize surgery for her son to remove the extra digits he was born with on each hand. Carol would not consent to the surgery unless David was in her custody. Subsequently, David was brought to the emergency room to address a possible infection in one of his extra digits. Still, Carol refused to permit the recommended surgery. Accordingly, the Division filed an emergent

application with the court to allow the surgery to proceed.  At that point, Carol relented and agreed to the procedure.

In July 2019, Carol identified A.H. (Anna) as a potential placement for David, claiming Anna was David's godmother.  But Carol initially was unable to provide Anna's contact information or her last name to the Division.  Once the Division located Anna, she offered to care for David, but told the Division it should return David to Carol's custody.  Anna's husband, W.P. (Wayne) also advised the Division he was willing to accept David into his home.  Although Wayne informed the Division he lived in Pennsylvania during the work week and only returned home to New Jersey on weekends, he refused to let the Division assess his home in Pennsylvania.

By October 2019, the Division assessed Anna's and Wayne's New Jersey home.  Anna continued to maintain the Division mistakenly removed David from Carol's care.  Anna further suggested Carol could move into her home.  Shortly thereafter, the Division sent Anna a rule-out letter based on its concern she did not appreciate the extent of Carol's untreated mental health issues, and because neither Anna nor Wayne allowed the Division to assess Wayne's Pennsylvania home.  The Division did not send Wayne a separate rule-out letter.

A-1092-21

As the litigation progressed, the Division offered Carol weekly visits with David on Wednesdays and Fridays. Carol only attended Wednesday visits. And she was frequently late or left the visits early after becoming aggressive with Division workers. Moreover, she declined virtual visits during the height of the COVID-19 pandemic because Ellen and Alex rejected Carol's demand that she be able to see the resource parents during her remote visits with David. Based on her intransigence, Carol did not see David between March and December 2020.

Although the Division received and requested two ninety-day extensions to allow Carol to achieve reunification, by November 2020, it sought and received approval for its permanency plan to terminate Carol's and John's parental rights to David followed by adoption. The Division filed a guardianship complaint the following month.

Prior to trial, the Division scheduled psychological and bonding evaluations for Carol, John, and David's resource parents. Carol did not participate in these evaluations. Carol also refused to submit to a bonding evaluation arranged by the Law Guardian.

Dr. Alan J. Lee conducted the bonding evaluations arranged by the Division. He met with David and his resource parents when the child was

twenty-two months old. By then, David had lived with Ellen and Alex for twenty months. Dr. Lee concluded David had a significant, positive bond with his resource parents and the child would suffer severe and enduring psychological or emotional harm if their relationship ended.

When Dr. Michael Wiltsey conducted his bonding evaluations at the Law Guardian's behest, he, too, found David had a strong attachment to his resource parents and the child understood Ellen and Alex were his primary caretakers.

II.

The guardianship trial commenced in August 2021 and concluded the following month. At times, Carol absented herself from the proceedings, including halfway through the first day of trial and throughout the second day. Carol also often interrupted the trial while present in the courtroom.

The Division called Dr. Lee, as well as its caseworker, David Westman, and a Division supervisor, Megan Kellerman, to testify at trial. Additionally, the Division called Ellen to testify. Consistent with his reports, Dr. Lee testified David "had formed a significant and positive psychological attachment and bond" with Ellen and Alex, and "there [was] a significant risk of the child . . . suffering severe and enduring harm if his attachment and relationship with" either resource parent "permanently ended."

A-1092-21

Dr. Lee stressed that "[p]ermanency is very important for any child, but especially a younger child." He opined a child without permanency "is left in a state of being . . . uncertain as to whom he can count on to protect him, to guide him, . . . and to nurture him." Further, Dr. Lee stated if David's bond with his resource parents was severed, the child "would be at a significant risk for behavioral problems, impulse control problems, aggression, [and] disorganized behaviors," as well as "depression and anxiety." Moreover, Dr. Lee testified that if David's bond with his resource parents ended, the child's self-esteem would likely suffer, and he could be expected to have "problems in his academic functioning."

The Law Guardian called Dr. Wiltsey to testify. Dr. Wiltsey opined David was "positively bonded" with his resource parents and "view[ed] them as his primary caregivers." Dr. Wiltsey also concluded Ellen and Alex provided David with the "commitment" and "consistency" he needed.

Carol presented no witnesses and offered no exhibits at trial.

Based on the considered opinions of Drs. Lee and Wiltsey, as well as his determination the "testimony of the witnesses [was] generally credible," the judge concluded the Division met its burden of proof and established by clear

A-1092-21

and convincing evidence the four prongs under N.J.S.A. 30:4C-15.1(a). Thus, he terminated Carol's and John's parental rights.

### III.

On appeal, Carol challenges the judge's findings on the four prongs. She raises several arguments, including: (1) the judge erred in finding she endangered David "because there was no finding of abuse or neglect in this matter" and no proof she could not safely care for David; (2) the judge mistakenly concluded she could not "remediate her perceived parenting issues"; (3) the Division "did not strive to overcome barriers to services," failed to properly consider alternative placements, and neglected to issue Wayne a rule-out letter; and (4) the judge erroneously found termination of Carol's parental rights would not do more harm than good and was in David's best interests because the judge erroneously afforded "undue weight" to the experts' "biased" opinions, and failed to recognize the Division did not "prove the first three [statutory] prongs of the best interests test." Having considered these arguments and others pressed by Carol, we are not persuaded.

In reviewing a decision by a trial court to terminate parental rights, we give deference to family courts' fact-finding "[b]ecause of the family courts' special jurisdiction and expertise in family matters." Cesare v. Cesare, 154 N.J.

394, 413 (1998). A Family Part judge's findings of fact are not disturbed unless "'they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice.'" Id. at 412 (quoting Rova Farms Resort, Inc. v. Invs. Ins. Co., 65 N.J. 474, 484 (1974)).

Parents have a constitutionally protected right to raise their children. N.J. Div. of Youth & Fam. Servs. v. A.W., 103 N.J. 591, 599 (1986); see also Santosky v. Kramer, 455 U.S. 745, 753 (1982). That right is not absolute. N.J. Div. of Youth & Fam. Servs. v. R.G., 217 N.J. 527, 553 (2014) (citing In re Guardianship of K.H.O., 161 N.J. 337, 347 (1999) (citation omitted)). Parental rights are "tempered by the State's parens patriae responsibility to protect the welfare of children," K.H.O., 161 N.J. at 347 (citation omitted), when the child's "'physical or mental health is jeopardized,'" A.W., 103 N.J. at 599 (quoting Parham v. J.R., 442 U.S. 584, 603 (1979)).

Under N.J.S.A. 30:4C-15.1(a), the Division must satisfy the following prongs by clear and convincing evidence before a parent's rights can be terminated:

> (1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;

A-1092-21

(2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm[3];

(3) The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the [judge] has considered alternatives to termination of parental rights; and

(4) Termination of parental rights will not do more harm than good.

The four prongs are not "discrete and separate" but "relate to and overlap with one another to provide a comprehensive standard that identifies a child's best interests." K.H.O., 161 N.J. at 348. "The considerations involved in determinations of parental fitness are 'extremely fact sensitive' and require particularized evidence that address the specific circumstances in the given case." Ibid. (quoting In re Adoption of Child. by L.A.S., 134 N.J. 127, 139 (1993)).

---

[3] On July 2, 2021, the Legislature enacted L. 2021, c. 154, deleting the last sentence of N.J.S.A. 30:4C-15.1(a)(2), which read, "[s]uch harm may include evidence that separating the child from [the child's] resource family parents would cause serious and enduring emotional or psychological harm to the child." To the extent the judge here referenced David's risk for "severe and enduring harm" if his relationship with his resource parents ended, we are satisfied the judge did so in the context of summarizing Dr. Lee's opinion and that he did not mistakenly rely on this aspect of the expert's opinion to conclude the Division satisfied its burden under N.J.S.A. 30:4C-15.1(a)(2).

Here, it is evident the trial judge carefully reviewed the proofs presented before concluding the Division satisfied all the legal requirements to sustain a judgment of guardianship. Moreover, the judge's written opinion painstakingly tracks the four prongs of the best interests of the child test, N.J.S.A. 30:4C-15.1(a), and his findings are well supported by substantial and credible evidence in the record. Thus, we affirm substantially for the reasons set forth in his comprehensive and well-reasoned decision. We add the following comments.

A. First Prong

Carol contends the judge erred in finding the Division satisfied prong one under N.J.S.A. 30:4C-15.1(a). We disagree.

The first prong of the best interests test requires the Division demonstrate that the "child's safety, health, or development has been or will continue to be endangered by the parental relationship." N.J.S.A. 30:4C-15.1(a)(1); see K.H.O., 161 N.J. at 352. The concern is not only with actual harm to the child but also the risk of harm. In re Guardianship of D.M.H., 161 N.J. 365, 383 (1999). The focus is not on a single or isolated event, but rather "on the effect of harms arising from the parent-child relationship over time on the child's health and development." K.H.O., 161 N.J. at 348. However, a judge does not need to wait "until a child is actually irreparably impaired by parental inattention

or neglect" to find child endangerment. D.M.H., 161 N.J. at 383. The Court has explained that a parent's withdrawal of nurture and care for an extended period is a harm that endangers the health of a child. Id. at 379 (citing K.H.O., 161 N.J. at 352-354). When children "languish in foster care" without a permanent home, their parents' failure to provide "a safe and stable home" may itself constitute harm. Id. at 383.

Here, the judge found Carol was "admittedly . . . diagnosed with paranoid schizophrenia and was prescribed medication, but she . . . neglected to take [the medication], instead continuing to express and act on paranoid thoughts to the Division, in court, and to [David's] resource parents." Further, the judge concluded Carol's behavior "inhibit[ed] her interactions with her own child" and her refusal to engage in services recommended by the Division "prolonged [David's] time in foster care." Moreover, he found that due to her "distrust and paranoia," Carol "originally refused to give doctors consent to operate on [David's] extra digits" in his hand, and because this medical issue was "left unaddressed for too long," David's digits "became infected," causing the court to conduct "an emergency proceeding so . . . the Division could get authorization for [the child's] surgery, and only then did [Carol] consent to it."

13

These findings are amply supported by the record. Accordingly, there is no basis for us to disturb the judge's determination regarding prong one.

B. Second Prong

Carol next challenges the judge's finding on prong two of the best interests test, arguing she engaged in services "sufficient to address [the Division's] concerns." We are not convinced.

The second prong of the best interest determination "in many ways, addresses considerations touched on in prong one." N.J. Div. of Youth & Fam. Servs. v. F.M., 211 N.J. 420, 451 (2012). Often, evidence supporting the first prong may also support the second prong. D.M.H., 161 N.J. at 379. This prong "relates to parental unfitness," K.H.O., 161 N.J. at 352, and "the inquiry centers on whether the parent is able to remove the danger facing the child," F.M., 211 N.J. at 451 (citing K.H.O., 161 N.J. at 352). The Division can satisfy this inquiry by showing the parent cannot provide a safe and stable home and the child will suffer substantially from a lack of stability and permanent placement. N.J. Div. of Youth & Fam. Servs. v. M.M., 189 N.J. 261, 281 (2007) (citing K.H.O., 161 N.J. at 352).

Here, the judge concluded Carol "withheld parental attention and care by not engaging with the Division and failing to comply with recommended

14                                                              A-1092-21

services."  He also found Carol's "inaction allowed [David] to form a significant and secure bond with his resource parents."  As the judge noted, not only did Carol "refuse[] to take medications prescribed to her or go to the therapeutic services offered to her by the Division," but after she engaged in "services through her own providers, she refused to sign releases or permit disclosure concerning any progress she may have made."  The judge also concluded Carol's "hostile preoccupation with the Division and [David's] resource parents . . . kept her from visiting with [the child] consistently and meaningfully.  She went months without visiting him and cut visits short because of her aggression toward others."  Accordingly, the judge found Carol was "unable to offer [David] stability and a sense of permanency that he will need" and it was not in the child's "best interests to continue delaying his stability."

Because the record clearly supports the judge's conclusion that Carol was unable or unwilling to provide a safe and stable home for David and the delay of permanent placement would add to the harm, there is no basis to disturb his findings on the second prong.

C.  Third Prong

Carol also contends the Division's proofs fell short on the third prong because the Division "did not strive to overcome barriers to services," and the Division failed to explore alternatives to termination.  Again, we disagree.

The third prong requires evidence "[t]he [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the [judge] has considered alternatives to termination of parental rights."  N.J.S.A. 30:4C-15.1(a)(3). "Reasonable efforts may include consultation with the parent, developing a plan for reunification, providing services essential to the realization of the reunification plan, informing the family of the child's progress, and facilitating visitation."  M.M., 189 N.J. at 281 (internal quotation marks and citations omitted).  The reasonableness of the Division's efforts regarding the provision of services to a parent is not measured by the success of the services.  D.M.H., 161 N.J. at 393.

Here, the Division coordinated numerous services for Carol, including visits — many of which she missed — and an expedited psychiatric referral so Carol could begin the process of reunification sooner.  Further, the Division

16

arranged for Carol to participate in psychological and bonding evaluations and recommended other service providers for her benefit.

The Division was not obliged to offer programs and services chosen by Carol. Instead, it was required to offer programs and services best suited to address her needs. As the judge recognized, the Division met its burden in this regard, yet Carol "consistently and aggressively thwarted any of the Division's attempts to work with her and help her reunite with" David.

Regarding Carol's argument that the judge erred in finding no alternative to termination of her parental rights existed, again, we disagree. As the judge observed in his written opinion, the Division explored kinship legal guardianship for David, but Ellen testified she and Alex preferred adoption over a kinship legal guardianship. Additionally, the judge found the Division assessed both Anna and Wayne. Anna was ruled out after she repeatedly claimed the Division mistakenly removed David from Carol, and she stated Carol could live with her, thus demonstrating her lack of understanding about the extent of Carol's mental health issues. Also, Anna and Wayne were ruled out because they would not allow the Division to assess Wayne's home in Pennsylvania. Anna did not appeal from the rule-out letter or indicate she was interested in being a long-term placement option for David.

 A-1092-21

To the extent Carol argues the Division failed to send a rule-out letter to Wayne, the record reflects the judge considered this argument, as well as the Division's position it followed the applicable procedures for ruling out Anna's and Wayne's placement. Citing N.J. Div. of Youth & Fam. Servs. v. K.L.W., 419 N.J. Super. 568, 581 (App. Div. 2011), the judge observed, "even if the Division fails to comply with the statutory obligation to assess relatives, the court should only delay permanency for the child if it is in the child's best interest." Thus, the judge found any purported failure on the part of the Division to provide a rule-out letter for Wayne did "not preclude [him] from determining that delaying permanency to remedy this perceived oversight [was] not in [David's] best interests."

We agree with the judge's analysis. Not only did the Division assess Anna and Wayne, but it ruled out placement in their home given Anna's interest in having David returned to Carol as soon as possible, her refusal to acknowledge the safety concerns Carol posed to David, and the Division's inability to secure consent from Anna and Wayne to assess Wayne's Pennsylvania home. Also, the record lacks any evidence Anna asked the Division to consider her as a placement again after she was ruled out. More importantly, as we have cautioned, "[d]elay of permanency or reversal of termination based on the

18

Division's noncompliance with its statutory obligations is warranted only when it is in the best interests of the child." Ibid. (citations omitted). Thus, we conclude the judge did not err in finding the Division satisfied the third prong.

D. Fourth Prong

Finally, Carol's contention the judge erred in finding termination of Carol's rights would not do more harm than good is without merit. R. 2:11-3(e)(1)(E).

The fourth prong of N.J.S.A. 30:4C-15.1(a)(4) serves as "a 'fail-safe' inquiry guarding against an inappropriate or premature termination of parental rights." F.M., 211 N.J. at 453 (citations omitted).

> [T]he fourth prong of the best interests standard cannot require a showing that no harm will befall the child as a result of the severing of biological ties. The question to be addressed under that prong is whether, after considering and balancing the two relationships, the child will suffer a greater harm from the termination of ties with [the child's] natural parents than from the permanent disruption of [the] relationship with [the child's] foster parents.
>
> [K.H.O., 161 N.J. at 355.]

"The crux of the fourth statutory subpart is the child's need for a permanent and stable home, along with a defined parent-child relationship." N.J. Div. of Youth & Fam. Servs. v. H.R., 431 N.J. Super. 212, 226 (App. Div.

A-1092-21

2013) (citing N.J. Div. of Youth & Fam. Servs. v. C.S., 367 N.J. Super. 76, 119 (App. Div. 2004)).  "If one thing is clear, it is that the child deeply needs association with a nurturing adult.  Since it seems generally agreed that permanence in itself is an important part of that nurture, a court must carefully weigh that aspect of the child's life."  A.W., 103 N.J. at 610 (citations omitted).

Here, as the judge noted, Carol deprived him of the opportunity to consider expert testimony regarding her bond with David because "she refused to participate in either [Dr. Lee's or Dr. Wiltsey's] bonding evaluation[s]."  Nevertheless, the judge considered the testimony of both experts before finding David viewed his resource parents "as his mothers, referring to them [both] as 'mommy'" and crediting the testimony of "[b]oth psychologists [who] determined that there existed a secure and positive bond between [David] and the resource parents."  The judge also found Carol's "consistent choice to flout Division recommendations and failure to adequately care for herself show that she is incapable of putting the best interests of her child over her own self-interests."  Further, the judge concluded David's resource parents were willing to adopt David, they were "[t]he only people who can provide for the needs of this child now or in the foreseeable future," and "[a]doption by the current resource parents will allow [David] to achieve the permanency he deserves."

These findings under prong four are amply supported by credible evidence in the record.

In sum, we perceive no basis to disturb the guardianship judgment. To the extent we have not addressed Carol's remaining arguments, we conclude they are without sufficient merit to warrant further discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

21